UNITED STATES of America, Plaintiff–Appellee,

v.

Leonard SASSON, Defendant–Appellant.

No. 94–2158.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 9, 1995.

Decided July 31, 1995.

Rehearing and Suggestion for Rehearing En Banc Denied Sept. 22, 1995.

---

Barry Rand Elden, Asst. U.S. Atty., Brian Havey (argued), Office of the U.S. Atty. Crim. Receiving, Appellate Div., Chicago, IL, for U.S.

Carol A. Brook, Paul Flynn (argued), Office of the Federal Defender Program, Chicago, IL, for Leonard Sasson.

Before BAUER, COFFEY, Circuit Judges, and CRABB, Chief District Judge.*

COFFEY, Circuit Judge.

Leonard Sasson was charged with and convicted of one count of conspiracy to possess with the intent to distribute and five counts

---

* Honorable Barbara B. Crabb of the Western District of Wisconsin, sitting by designation.

of distribution of controlled substances, Dilaudid,[1] Ritalin, and Morphine. *See* 18 U.S.C. § 2; 21 U.S.C. §§ 841(a)(1) and 846. He was sentenced to 150 months of imprisonment to be followed by ten years of supervised release. On appeal, Sasson argues that the district court improperly limited his cross-examination of a government witness in violation of his Sixth Amendment right to confrontation, and that the evidence was insufficient to support his conviction. Sasson also challenges his sentence, claiming that the district court erred in using the gross weight of the Dilaudid tablets, rather than only the weight of the controlled substance contained in the tablets, in calculating the length of his sentence. *See* U.S.S.G. § 2D1.1. Additionally, Sasson argues that the district court's imposition of a ten-year supervised release term was unauthorized by the Sentencing Guidelines. *See* U.S.S.G. § 5D1.2(a). We affirm Sasson's conviction and his prison term, and remand the case to the district court for resentencing only as to the term of supervised release.

## I. Background

On April 28, 1993, several bottles of pharmaceutical drugs, including Dilaudid and Ritalin, were stolen from the Carriage Way Pharmacy in Lake Bluff, Illinois. Upon investigation, it was determined that both Sasson and his co-defendant John Ryan were in the pharmacy on the date and at the approximate time of the theft. While Sasson was in the pharmacy, he asked Evange Bozinis, the owner of the pharmacy, to assist him in selecting mouthwashes, requesting information concerning the alcohol content of various mouthwashes. Because the mouthwashes were located on the bottom shelf of the aisle, Bozinis bent down to read the ingredients for Sasson. During this same time frame, the cashier of the pharmacy observed Sasson's codefendant Ryan browsing in the store.

Shortly thereafter, Bozinis discovered that a cardboard box containing controlled substances and stored in a locked cabinet was missing. Bozinis immediately notified the police department, and an officer was dispatched to the scene. Although Bozinis and the officer walked around the pharmacy in an attempt to determine if the box was left someplace in the store, they were unable to locate it at that time. A few days later, Bozinis presented an inventory of the missing narcotics to the Illinois Department of Professional Regulations (IDPR) and the Drug Enforcement Agency (DEA). It was not until three months later that Bozinis discovered the cardboard box on the bottom shelf of an aisle next to the wall in the pharmacy.[2] The box still contained some controlled substances. Among the controlled substances discovered missing from the box were Dilaudid, Ritalin, Tylox, Codeine Phosphate and Codeine Sulfate.

On May 4, 1993, within a week of the reported theft at the Carriage Way Pharmacy, Sasson's co-defendant, Ryan, arranged to sell 100 Ritalin tablets to a state undercover narcotics agent Richard Sandford. Sasson drove Ryan to the meeting place, a restaurant parking lot in Bensenville, Illinois, and parked his white Chevy Impala[3] across the street from the restaurant. Ryan and Agent Sandford conducted the sale in Sandford's car, while Sasson was observed watching the transaction from across the street. During the sale, Ryan told Agent Sandford that he could sell him more Ritalin as well as other pharmaceutical narcotics. Agent Sandford agreed to purchase another 100 tablets of Ritalin the following day.

The parties met the following day at the parking lot of the Holiday Inn in Elmhurst, Illinois. Sasson drove Ryan to the meeting place and waited across the street in a parking lot. During the transaction, which took

---

**1.** Dilaudid, commonly known as "drugstore heroin," is a prescription drug containing hydromorphone, a Schedule II controlled substance. *See* 21 U.S.C. § 812; *United States v. Lacour*, 32 F.3d 1157, 1158 n. 1 (7th Cir.1994).

**2.** Bozinis had used the area for overstocked items. The box was found hidden under bags of cotton.

**3.** State vehicle registration records show that the vehicle was registered under a false name with a false driver's license number. The registered address of the owner, however, matched the address listed on Sasson's driver's license.

place in Agent Sandford's car, Ryan asked Sandford whether he was interested in buying some pharmaceutically prepared Dilaudid tablets that were still in the bottles. Sandford agreed to arrange a deal later. Ryan then exited Agent Sandford's vehicle and was observed, by a surveillance agent, walking toward the Impala. While Ryan was approaching the Impala, a police vehicle stopped the Impala. At that point, Ryan quickly turned around and walked the other way. A police officer approached Sasson and another person in the vehicle and inquired why they were there. Sasson responded that they had brought a friend to purchase tires, but it is interesting to note that there are no tire shops in the immediate vicinity. When asked where their friend was, Sasson and his passenger looked ill at ease and acted nervously. They explained that the friend was there somewhere looking for the tire shop. The police officer later observed Sasson pulling away in the Impala and driving to where Ryan was standing, and Ryan quickly entering the vehicle.

On the following day, Ryan and Agent Sandford arranged a deal over the phone for the purchase of Dilaudid tablets previously offered. Ryan informed Agent Sandford of Sasson's encounter with the police the day before, stating that the person he had brought to the transaction was hassled by a police officer. Agent Sandford responded that he had never had a problem with the Holiday Inn parking lot, and accused Ryan of putting him at risk by conspicuously stationing someone across the street. Ryan agreed to continue to use the Holiday Inn parking lot for future drug transactions. Over the next several days, Ryan and Agent Sandford continued to discuss the terms of the Dilaudid deal. Sandford also inquired of Ryan about the price of Morphine. In response, Ryan stated, "our man has still got to check on that."

The third drug transaction took place on May 10. As with the previous transaction, Sasson drove Ryan to the Holiday Inn parking lot and waited nearby while Ryan conducted the sale in Agent Sandford's vehicle. The parties did not speak again until May 27 when Ryan told Agent Sandford over the

telephone that his group had some pharmaceutically prepared cocaine and Dilaudid for sale. In response to an inquiry about the price of the pharmaceutical cocaine, Ryan stated that he did not know, and that he needed to "check with [his] guy" but would call Sandford right back. Ryan's telephone records indicate that Ryan placed a call shortly thereafter to the residence of one Nancy McNeil, located at 1822 West Byron, Chicago, Illinois, where Sasson resided at times. Following that call, Ryan telephoned Agent Sandford back and quoted the price for pharmaceutical cocaine as $1,250. When Agent Sandford complained that the price was too high, Ryan explained that his group did not do "stickups," but would steal drugs from pharmacy safes. Despite Ryan's emphasis on the efforts expended by his group in obtaining the drugs, Agent Sandford continued to insist that the price was too high. Ryan then placed another telephone call to the McNeil residence. Ryan later informed Agent Sandford that he had spoken to "our boy again," and that he would lower the price to $800. In the taped conversation, Ryan stated that "I work with these guys, but . . . sometimes . . . they come with some prices that are . . . off the wall." He also informed Agent Sandford that members of his group generally split the profits from the drug sales and that he was trying to sell the drugs that other members had obtained.

On June 3, 1993, Agent Sandford and Ryan again spoke on the phone to arrange for a Dilaudid deal. Agent Sandford agreed to buy two bottles of Dilaudid for $1,600 that afternoon at the Elmhurst Holiday Inn. Sasson again conveyed Ryan to the Holiday Inn parking lot. When Ryan entered Agent Sandford's vehicle, he stated that he would lower the price because he did not have the agreed quantity of Dilaudid. Ryan explained that he was working with three other people who sometimes would sell the drugs without giving him advance notice. Agent Sandford agreed to purchase the available Dilaudid. At the conclusion of the sale, Sandford advised Ryan that he was interested in doing larger deals and meet less frequently. Ryan stated that they currently were out of drugs but that they were going to make a "run" that weekend to "pick up" some Dilaudid and

Morphine for Agent Sandford. Sandford asked Ryan whether he had someone that he trusted and took care of business for him when he was not available. Gesturing toward the Impala in which Sasson was observed waiting, Ryan responded that he had a partner, and stated that he would introduce his partner to Agent Sandford at the time of the next sale. After Ryan returned to the Impala, surveillance agents followed the Impala to 1822 West Byron, in Chicago, Illinois, which was the McNeil residence where Sasson sometimes resided.

On June 7, Ryan contacted Agent Sandford to set up a future sale. During the recorded conversation, Ryan agreed to sell various quantities of Dilaudid and Morphine tablets, and the parties agreed to meet the following day in the lobby of the Elmhurst Holiday Inn. After the discussion, Ryan placed another telephone call to the McNeil residence. On the following day, surveillance agents observed Sasson and Ryan walking around the lobby, whispering among themselves and looking out the window in the direction of the parking lot. Upon Agent Sandford's arrival, Ryan walked out of the lobby and entered Sandford's vehicle. Sasson stayed in the lobby near the entrance of the Holiday Inn, and watched the transaction that was taking place in the parking lot. During the taped conversation of the sale, Ryan stated that they would steal drugs from two pharmacies every seven to ten days and even traveled out of state to steal controlled substances from pharmacies. When Agent Sandford asked about the person who had accompanied Ryan to all of the previous drug transactions, Ryan responded that the person was his partner.[4]

Before the conclusion of the sale, Agent Sandford signaled for arrests. As Sasson was being arrested, he threw something into his mouth and swallowed it before the officer could stop him. An inventory search of Sasson's vehicle uncovered a piece of paper that contained the following notations:

| LENNY | 2238 |
| J.R. | 2238 |
| COOKIE | 1105 |
| JOHN | 2239 |
| | 7820 |

Two months after Sasson's arrest, James Portner, a DEA investigator assigned to the Sasson case, learned of the theft at the Carriage Way Pharmacy. He interviewed Bozinis, the pharmacist, and Lola Kukuk, the cashier of the pharmacy, both of whom identified Sasson and Ryan as having been in the pharmacy on the date in question and at the approximate time of the theft.

On September 17, 1993, approximately one week before Sasson's trial, Agent Portner informed the prosecutor that the DEA had a pending civil investigation concerning whether to revoke Bozinis' license to dispense pharmaceutically prepared controlled substances. The investigation stemmed from charges brought against Bozinis by the IDPR for Bozinis' alleged violations of, among other things, laws governing recordkeeping and the dispensing of pharmaceutical controlled substances. Allegations against Bozinis included numerous instances of unauthorized sale of controlled substances as well as failure to store the controlled substances in a secured storage area. Bozinis had signed a consent order in July 1990 agreeing that he "[was] careless in recordkeeping and authorization," but without either admitting or denying guilt of the specific allegations contained in the IDPR's complaint against him. In mitigation, Bozinis "offer[ed] that [he] did not intend to violate any law or regulation." Pursuant to the consent order, Bozinis' license was suspended for a ninety-day period followed by a two-year probation. Bozinis completed his probation in 1992.

Upon learning of the DEA's pending investigation, the United States Attorney in charge of the case filed an *ex parte* motion with the court requesting that the information not be disclosed to the defense. The government also submitted an affidavit of the DEA investigator in charge of investigating Bozinis. The affidavit set forth information dealing with the regional DEA office's recommendation that a hearing be held for Bozinis to show cause why his registration should not be revoked, and that the office

4. Agent Sandford did not ask for, nor did Ryan give, the name of Ryan's partner at this time.

was awaiting a response from Washington. The affiant also stated his belief that Bozinis was not aware of the pending investigation by the DEA, and that Bozinis would be notified of the investigation only if the regional DEA office gets approval to go forward with its request for a "Show Cause" hearing. Although the affidavit was dated September 1993, it stated that Bozinis' registration "was due to expire [on] August 31, 1993, and [was] awaiting renewal" at the time of the affidavit.

Prior to the trial, the district court ruled on the *ex parte* motion concluding that the government need not disclose any information to the defense concerning the DEA's pending investigation of Bozinis. Following jury selection, the district court also granted the government's oral motion to limit defense counsel's cross-examination of Bozinis on matters pertaining to the IDPR investigations.

## II. Analysis

### A. Sixth Amendment Right to Confrontation

 Sasson argues that the district court violated his Sixth Amendment right to confrontation by not allowing him to cross-examine Bozinis on matters relating to the IDPR's prior investigations of Bozinis. He also argues that the district court erred in granting the government's *ex parte* motion not to disclose information concerning the DEA's pending investigation of Bozinis.[5] Sasson claims that had the court allowed Bozinis to be subject to cross-examination on the investigations, the jury might have concluded that Bozinis was biased and had possibly colored or tailored his testimony to curry favor with the government. Additionally, in light of Bozinis' prior violations of laws relating to the sale and/or dispensing of controlled substances and his awareness that his license was subject to renewal around the time of his testimony at Sasson's trial, Sasson argues that Bozinis might have attempted to divert any potential criminal or civil investigations from himself for the missing controlled substances. According to Sasson, without the information of Bozinis' prior suspension, probation and disciplinary experience with the state, the jury was "left with a false impression of professionalism and neutrality on the part of Bozinis."

Whether the failure to disclose the information violates Sasson's Sixth Amendment right to confrontation is another question. The Supreme Court has made it clear in *Pennsylvania v. Ritchie*, 480 U.S. 39, 52, 107 S.Ct. 989, 999, 94 L.Ed.2d 40 (1987), that "the right to confrontation is a *trial* right, designed to prevent improper restrictions on the types of questions that defense counsel may ask during cross-examination." *See also California v. Green*, 399 U.S. 149, 157, 90 S.Ct. 1930, 1934–1935, 26 L.Ed.2d 489 (1970); *Barber v. Page*, 390 U.S. 719, 725, 88 S.Ct. 1318, 1322, 20 L.Ed.2d 255 (1968). Thus, the ability to question adverse witnesses does not include "the power to require the pretrial disclosure of any and all information that might be useful in contradicting unfavorable testimony." *Ritchie*, 480 U.S. at 53, 107 S.Ct. at 999. The proper inquiry is whether the defense counsel received sufficient latitude at trial to question witnesses such that the defense was given an opportunity for effective cross-examination. *Id.* The question of whether the district court erred in granting the motion to withhold information concerning the DEA's pending investigation of Bozinis, therefore, is intertwined with the issue of whether the limitation of Sasson's cross-examination violated the Confrontation Clause.

---

**5.** Sasson submits that there was a *Brady* violation when the district court granted the government's *ex parte* motion to withhold information concerning the DEA's pending investigation against Bozinis. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. at 1196. In this case, however, the withheld information does not fall under the scope of *Brady* because it is neither exculpatory nor material to Sasson's guilt. The disclosure of the suppressed evidence would not have made a different result reasonably probable because, as will be discussed later, it concerns an adverse witness' conduct separate and independent from Sasson's criminal prosecution. *See United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Thus, although disclosure of the information might have been helpful to the defense to cast doubt on the witness' testimonial reliability, it does not necessarily implicate the due process analysis under *Brady*. "The Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense." *Kyles v. Whitley*, ─── U.S. ───, ───, 115 S.Ct. 1555, 1567, 131 L.Ed.2d 490 (1995).

▮ The Confrontation Clause of the Sixth Amendment guarantees the right of an accused to "be confronted with the witnesses against him." U.S. Const. amend. VI; *see also Delaware v. Van Arsdall*, 475 U.S. 673, 678, 106 S.Ct. 1431, 1434–1435, 89 L.Ed.2d 674 (1986). The right of confrontation "means more than being allowed to confront the witness physically." *Van Arsdall*, 475 U.S. at 678, 106 S.Ct. at 1434 (quoting *Davis v. Alaska*, 415 U.S. 308, 315, 94 S.Ct. 1105, 1109–1110, 39 L.Ed.2d 347 (1974)). "The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." *Id.* The right to cross-examine adverse witnesses, however, is not absolute because the Confrontation Clause guarantees only an opportunity for a thorough and effective cross-examination, "not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15 (1985) (per curiam). Thus, so long as the defendant is guaranteed an opportunity for effective cross-examination, the district court retains wide latitude to impose reasonable limits on the scope and extent of cross-examination "based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety or interrogation that is repetitive or only marginally relevant." *Van Arsdall*, 475 U.S. at 679, 106 S.Ct. at 1435.

▮ In order to establish a violation of the Confrontation Clause, the defendant is not required to show prejudice with respect to the trial as a whole, but rather, the focus is on individual witnesses. As the Supreme Court has instructed in *Van Arsdall*, 475 U.S. at 680, 106 S.Ct. at 1435, "the focus of the prejudice inquiry in determining whether the confrontation right has been violated must be on the particular witness, not on the outcome of the entire trial." "Normally the right to confront one's accusers is satisfied if defense counsel receives wide latitude at trial to question witnesses." *Ritchie*, 480 U.S. at 53, 107 S.Ct. at 999. We review the trial court's limitation on the scope of cross-examination for an abuse of discretion. *United States v. Jackson*, 51 F.3d 646, 651 (7th Cir.1995); *United States v. Nelson*, 39 F.3d

705, 708 (7th Cir.1994). However, where the limitations directly implicate the Sixth Amendment right to confrontation, our review is *de novo*. *Jackson*, 51 F.3d at 651; *Nelson*, 39 F.3d at 708; *United States v. Neely*, 980 F.2d 1074, 1080 (7th Cir.1992); *United States v. Saunders*, 973 F.2d 1354, 1358 (7th Cir.1992), *cert. denied,* — U.S. ——, 113 S.Ct. 1026, 122 L.Ed.2d 171 (1993). When considering a challenge to a limitation on cross-examination, we must, therefore, "distinguish between the core values of the confrontation right and more peripheral concerns which remain within the ambit of the trial judge's discretion." *Jackson*, 51 F.3d at 651 (quoting *Saunders*, 973 F.2d at 1358).

▮ " '[T]he exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.' " *Van Arsdall*, 475 U.S. at 678–79, 106 S.Ct. at 1434–35 (quoting *Davis*, 415 U.S. at 316–17, 94 S.Ct. at 1110–11); *see also Ritchie*, 480 U.S. at 51–52, 107 S.Ct. at 998 ("[t]he right to cross-examination includes the opportunity to show that a witness is biased, or that the testimony is exaggerated or unbelievable."). We have recently held that once this "core function" is satisfied when the defense is allowed cross-examination to expose a motive to lie, "it is of peripheral concern to the Sixth Amendment how much opportunity defense counsel gets to hammer that point home to the jury." *Nelson*, 39 F.3d at 708; *see also United States v. Diaz*, 26 F.3d 1533, 1539 (11th Cir.1994), *cert. denied,* — U.S. ——, 115 S.Ct. 1110, 130 L.Ed.2d 1075 (1995) ("[O]nce there is sufficient cross-examination to satisfy the Confrontation Clause, further questioning is within the district court's discretion."). As stated before, the trial court has wide discretion in limiting the boundaries of proper and improper cross-examinations and may preclude "cumulative and confusing cross-examination into areas already sufficiently explored to permit the defense to argue personal bias and testimonial unreliability." *Nelson*, 39 F.3d at 708 (quoting *United States v. Robinson*, 832 F.2d 366, 373 (7th Cir.1987), *cert. denied,* 486 U.S. 1010, 108 S.Ct. 1739, 100 L.Ed.2d 203 (1988)). The inquiry in that situation is "whether the jury

had sufficient information to make a discriminating appraisal of the witness's motives and bias." *Id.* (citations and internal quotations omitted) (holding that district court's limitation on cross-examination did not implicate the defendant's core Sixth Amendment rights where defense was not denied the opportunity to establish that the witnesses may have had a motive to lie, but rather was merely denied "the opportunity to add extra detail to that motive"); *see also United States v. Dees,* 34 F.3d 838, 844 (9th Cir.1994); *Diaz,* 26 F.3d at 1539–40 (11th Cir.1994) ("the Sixth Amendment is satisfied where sufficient information is elicited to allow the jury to gauge adequately a witness' credibility and to assess his motives or possible bias"); *United States v. Coleman,* 997 F.2d 1101, 1105 (5th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 735, 126 L.Ed.2d 698 (1994).

▮ However, where the defense is completely foreclosed·from exposing the witness' bias[6] or motive to testify, the limitation may directly implicate the defendant's constitu-. tionally protected right of cross-examination. In *Van Arsdall,* 475 U.S. at 679, 106 S.Ct. at 1435, the Supreme Court found a Sixth Amendment violation where the trial court prohibited all inquiry into the possibility that the witness would be biased as a result of the state's dismissal of a pending charge against him. The witness had promised to speak to the government about a murder (of which the defendant was charged) in exchange for the state's dismissal of a public drunkenness charge. The Supreme Court found that by "cutting off all questioning about an event that the State conceded had taken place and that a jury might reasonably have found furnished the witness a motive for favoring the prosecution in his testimony, the [lower] court's ruling violated respondent's rights secured by the Confrontation Clause." *Id.* at 679, 106 S.Ct. at 1435. Although the Court concluded that a Sixth Amendment violation

had occurred, it nevertheless affirmed the defendant's conviction after evaluating, among other things, the overall strength of the prosecution's case and finding that the error was harmless beyond a reasonable doubt. *Id.* at 684, 106 S.Ct. at 1438.

.In this case, Sasson argues that he was precluded from inquiring into the possibility that the government witness Bozinis would be motivated to testify in favor of the prosecution in light of his prior problems with the IDPR concerning, among other things, his improper record-keeping and dispensing of controlled substances. Of particular relevance is the fact that allegations investigated by the IDPR included filling prescriptions of controlled substances that were unauthorized by physicians, failing to properly maintain records, possibly fabricating records, and failing to keep secure the storage for controlled substances. Around the time of his testimony, Sasson was also aware that his pharmacist license was subject to renewal. It is conceivable that had the defense counsel been permitted to pursue cross-examination on Bozinis' prior questionable conduct in dispensing controlled substances, a reasonable jury might have received a somewhat different impression of Bozinis' credibility, see *id.* at 680, 106 S.Ct. at 1435–36, and might have drawn inferences that Bozinis was motivated to curry favor with the government or at least was attempting to divert potential investigation from himself for the missing controlled substances.

On the other hand, unlike the government witness in *Van Arsdall,* Bozinis had been promised nothing in exchange for his testimony. No agreements nor plea bargains were discussed, and no benefits were bestowed. In fact, the pending DEA's civil investigation was not even revealed to Bozinis, and there is no indication in the record that Bozinis was even aware of the investiga-

---

**6.** The Supreme Court has instructed as follows: bias is a term used ... to describe the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party. Bias may be induced by a witness' like, dislike, or fear of a party, or by the witness' self-interest. Proof of bias is almost always relevant because the jury, as find- er of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony.
*United States v. Abel,* 469 U.S. 45, 52, 105 S.Ct. 465, 469, 83 L.Ed.2d 450 (1984); *see also· United States v. Johnson,* 26 F.3d 669, 682 n. 10 (7th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 344, 130 L.Ed.2d 300 (1994).

tion.[7] Also, any prior state investigation of Bozinis by the IDPR had concluded in a consent order in 1990, and there was no indication that the IDPR would reinitiate the investigation. Indeed, even if Bozinis had acted with a subjective fear that he might be investigated civilly or criminally for the missing controlled substances, this court has said that such a general fear is not enough to allow the admission of prior bad acts in an attempt to demonstrate bias. *Cf. United States v. West*, 670 F.2d 675, 683 (7th Cir.) (holding that a witness may be examined about bad acts for which he has not been convicted only if the examiner demonstrates, among other things, the existence of a promise not to prosecute), *cert. denied sub nom. King v. United States*, 457 U.S. 1124, 102 S.Ct. 2944, 73 L.Ed.2d 1340 (1982); *United States v. DeLeon*, 498 F.2d 1327, 1332–33 (7th Cir.1974) ("If a witness' general fear that he might be caught and prosecuted were sufficient to show bias, then the rule that past criminal conduct not resulting in conviction is inadmissible would never apply to government witnesses."). Here, all that Sasson was prepared to argue was that Bozinis had been investigated before and might have a subjective fear of being held accountable for the missing controlled substances.

The Supreme Court has never expressly delineated any specific factors that a criminal defendant must satisfy to establish a violation of the Confrontation Clause, but has generally used a flexible approach. The Court has stated:

> We think that a criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby "to expose to the jury the facts from which jurors ... could appropriately draw inferences relating to the reliability of the witness."

*Van Arsdall*, 475 U.S. at 680, 106 S.Ct. at 1436 (quoting *Davis*, 415 U.S. at 318, 94 S.Ct.

at 1111); *see also United States v. Diaz*, 876 F.2d 1344, 1349 (7th Cir.1989). In *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 the Supreme Court found a denial of the right of effective cross-examination under the Confrontation Clause where the defendant was precluded from cross-examining a prosecution witness about the witness' probation status. The government witness had been adjudicated a delinquent for burglarizing two cabins and was on probation when he identified the defendant as the perpetrator of the burglary at issue. In light of the witness' "vulnerable status as a probationer" as well as his "possible concern that he might be a suspect in the investigation," *id.* at 318, the Court held that the jury was entitled to have the benefit of the defense theory that the witness' possible bias caused him to make a faulty initial identification of the defendant. The Court also noted that the right of confrontation is paramount and outweighs the State's interest in protecting juvenile offenders.

Sasson's purported defense theory of witness bias, however, is not as compelling as that in *Davis* because Bozinis was not in the vulnerable position of being a probationer who faces the "undue pressure" of a possible revocation of his probationary status and thus, loss of liberty. *Id.* Bozinis had completed in 1992 his two-year term of probation (restricting the use of his pharmacy license) well before he testified in Sasson's trial. Moreover, the threat of criminal prosecution as the one faced by the government witness in *Davis* is far greater than that possibly faced by Bozinis; the IDPR and DEA investigations are civil in nature and deal merely with violations of administrative laws governing the record-keeping and dispensing of designated pharmaceutical controlled substances.

▮▮▮▮ In any event, even if the district court erred in precluding the line of questioning on Bozinis' problems with the IDPR and DEA, the error is harmless. *Van Ars-*

7. The government argues that Sasson could have asked for a *voir dire* of Bozinis to determine whether Bozinis knew about the pending DEA civil investigation. We think, however, that Sasson failed to request it in all probability because

counsel did not have knowledge of the DEA investigation; any information concerning the DEA investigation was submitted under seal in an *ex parte* motion to the district and not disclosed to the defense.

*dall,* 475 U.S. at 684, 106 S.Ct. at 1438. Our inquiry is "whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." *Id.* The factors to consider include, among other things, the importance of the witness' testimony in the prosecution's case, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, and the overall strength of the prosecution's case. *Id.*

In this case, Bozinis' testimony neither provided "a crucial link in the proof ... of [Sasson's criminal] act," *Davis,* 415 U.S. at 317, 94 S.Ct. at 1111, nor rendered Bozinis a key witness in the prosecution's case. Bozinis had testified that on the day of the theft, Sasson had approached him for assistance in selecting mouthwashes, and that Bozinis had bent down to read the labels for Sasson. The government sought to draw the inference that Sasson had diverted Bozinis' attention while Ryan committed the theft. As an initial matter, Sasson was not specifically charged with theft or being a party to the crime of theft, although theft was included in the facts of the conspiracy count. Thus, the manner in which the drugs were obtained was not an element of the charged offense of conspiracy and possession with the intent to distribute controlled substances. While Bozinis' testimony linking Sasson to the scene of the theft did assist in giving testimony supportive of the conspiracy charge,[8] the government was not without other corroborating evidence: the store cashier also identified both Ryan and Sasson as being present in the pharmacy on the date and at the approximate time of the theft, and furthermore, his coconspirator and codefendant Ryan admitted in a taped conversation that the group stole drugs from pharmacy safes. The government's case against Sasson was overwhelming. Eight different law enforcement officers and undercover agents from various law enforcement agencies testified as to the details and surveillance of, and the taping of conversations that transpired during, the five drug transactions giving rise to the criminal prosecution. Surveillance placed Sasson at the scene of each drug transaction, giving credence to the government's theory that Sasson had a counter-surveillance role in the conspiracy. The government's key witness, undercover Agent Sandford, who made the five drug deals with Sasson's codefendant Ryan, heard Ryan's comments about his "partner" and at the same time saw Ryan identify Sasson by gesturing toward him (Sasson). On at least two occasions when Ryan was negotiating with Agent Sandford as to the terms of the drug deals, telephone records reflect that calls were placed at approximately the same time from Ryan's telephone to a location where Sasson regularly resided, the McNeil residence.[9] Particularly, on one occasion immediately after Ryan told Sandford that he needed to check with his "guy" about the price, Ryan called the McNeil residence, and shortly thereafter again called Sandford to relate to Sandford the price quote. Finally, a note found in Sasson's Impala listed the distribution of drug profits between "Lenny," "J.R.," and two others, further implicating Sasson in the conspiracy. Given the overwhelming evidence of Sasson's guilt, we hold that any possible error that might have occurred in the district court's limiting of Sasson's cross-examination of Bozinis would have to be considered harmless.

## B. Sufficiency of Evidence

Sasson also challenges the sufficiency of evidence to convict. When reviewing a conviction for sufficiency of the evidence, we must consider the evidence and the

---

8. The indictment for the conspiracy count charges that it was a part of the conspiracy that "the defendants RYAN and SASSON ... travelled to various pharmacies and acquired, without lawful written prescription and by means of robbery, burglary, theft or deception, sealed and unsealed containers of Ritalin, Dilaudid, Morphine Sulfate and other Schedule II Controlled Substances."

9. The parties had stipulated that Sasson occasionally resided at the McNeil residence. In fact, surveillance agents had followed Sasson's Impala to the McNeil residence immediately after the June 3 drug transaction.

accompanying inferences in the light most favorable to the government. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). We will reverse "only when the record is devoid of any evidence, regardless of how it is weighed, from which a jury could find guilt beyond a reasonable doubt." *United States v. Garcia,* 35 F.3d 1125, 1128 (7th Cir.1994) (quoting *United States v. Gutierrez,* 978 F.2d 1463, 1468–69 (7th Cir.1992)); *see also Jackson,* 443 U.S. at 318–19, 99 S.Ct. at 2788–90. We will not reweigh the evidence or re-evaluate the credibility of witnesses. *United States v. Dortch,* 5 F.3d 1056, 1065 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1077, 127 L.Ed.2d 394 (1994).

■ Sasson was convicted of one count of drug conspiracy and five counts of possession with the intent to distribute and distribution of controlled substances. To sustain a conviction of conspiracy to distribute controlled substances, the government must establish that a conspiracy existed and that the defendant knowingly agreed to join it. *United States v. Burrell,* 963 F.2d 976, 987–88 (7th Cir.), *cert. denied sub nom. Henry v. United States,* —— U.S. ——, 113 S.Ct. 357, 121 L.Ed.2d 270 (1992). A conspiracy is "a confederation of two or more persons formed for the purpose of committing by their joint efforts, a criminal act." *United States v. Campbell,* 985 F.2d 341, 344 (7th Cir.1993). A defendant is a member of a conspiracy if he "knew of the conspiracy and ... intended to join and associate himself with its criminal design and purpose." *Id.* at 345. "When the sufficiency of the evidence to connect a particular defendant to a conspiracy is challenged on appeal, substantial evidence should be the test rather than slight evidence or slight connection." *United States v. Durrive,* 902 F.2d 1221, 1228 (7th Cir.1990). The government's evidence, however, can be entirely circumstantial. *United States v. Pazos,* 993 F.2d 136, 139 (7th Cir. 1993); *Durrive,* 902 F.2d at 1225; *United States v. Grier,* 866 F.2d 908, 922 (7th Cir. 1989) ("[b]ecause conspiracies are carried out in secret, direct proof of agreement is rare"); *United States v. Vega,* 860 F.2d 779, 793 (7th Cir.1988) ("[i]t is perfectly legitimate to prove a conspiracy by circumstantial evidence" because "[b]y its very nature, a conspiracy is conceived and carried out clandestinely, and direct evidence of the crime is rarely available") (quoting *United States v. Nesbitt,* 852 F.2d 1502, 1510 (7th Cir.1988), *cert. denied,* 488 U.S. 1015, 109 S.Ct. 808, 102 L.Ed.2d 798 (1989)).

■ Sasson does not challenge the existence of a conspiracy, and thus, the question before us is whether the government has provided substantial evidence to "demonstrate a participatory link between the conspiracy and the defendant." *Campbell,* 985 F.2d at 344. We are convinced that there was substantial evidence to link Sasson to the drug conspiracy. Sasson's co-defendant Ryan told Agent Sandford in a taped conversation that his group regularly stole drugs from pharmacies. Sasson and Ryan were both present in the Carriage Way Pharmacy at the approximate time when controlled substances were stolen from the pharmacy. Sasson was identified by Ryan on two occasions as his (Ryan's) "partner." At the June 3 sale, in response to Agent Sandford's inquiry about whether he had someone who he trusted and took care of business for him when he was not available, Ryan stated that he had a partner and gestured toward Sasson at the same time. Again, at the last transaction before his arrest, Ryan told Agent Sandford that the person who had accompanied him to all previous drug sales was his partner. Moreover, Sasson drove Ryan to, and was present at, the scene of all five drug transactions. On one occasion, Sasson lied to a police officer about his reason for being at the scene of the drug deal, stating that he drove a friend there to buy tires. Additionally, the Impala driven by Sasson to the transactions was registered under a false name with an address matching that on Sasson's driver's license.

■ It is true that Sasson did not personally negotiate or conduct the drug transactions with Agent Sandford, and did not have in his possession at the time of his arrest the usual "trappings" of a person involved in the drug trade, such as radio, pager, cellular phone and weapons. However, Sasson was not exactly "passing through

while a drug deal went down around him;" there are five unexplained appearances of Sasson at the drug transactions. *See United States v. Brigham,* 977 F.2d 317, 319 (7th Cir.1992). While mere presence at the scene of a drug deal is insufficient to establish membership in a drug conspiracy, *see United States v. Salazar,* 983 F.2d 778, 781 (7th Cir.1993); *Durrive,* 902 F.2d at 1225, "[p]resence or a single act will suffice ... if the circumstances permit the inference that the presence or act was intended to advance the ends of conspiracy." *United States v. Binkley,* 903 F.2d 1130, 1134 (7th Cir.1990); *see also Pazos,* 993 F.2d at 140. Specifically, engaging solely in counter-surveillance at a drug transaction is sufficient to prove participation or membership in a conspiracy to sell drugs. *Pazos,* 993 F.2d at 139. "Whether a defendant's behavior constitutes counter-surveillance or simply loitering is a question of fact for the jury to decide," *id.* at 139–140, and the fact that Sasson did not have all the usual "trappings" of a drug dealer is not dispositive. *See Brigham,* 977 F.2d 317 (affirming defendant's drug conspiracy conviction even though defendant did not directly participate in the actual drug and money exchange, and did not have a radio, pager, cellular phone, or any weapon with him at the time of the arrest). During all five drug transactions Sasson was present in the immediate area and strategically situated himself in a location where he was able to observe the exchanges between Ryan and Agent Sandford—he stationed himself and observed the transactions from his car, the hotel lobby and across the street. Sasson's presence and close proximity to the transactions gives great credence to the belief that he was trusted by Ryan and was in a position to assist Ryan if necessary. *See United States v. Rodriguez,* 975 F.2d 404, 412 (7th Cir.1992) ("it strikes us as incredible that [a drug dealer] would have a person accompany him to a drug deal ... where the person did not have the [drug dealer's] utmost trust and confidence.") (quoting *United States v. Perry,* 747 F.2d 1165, 1169 (7th Cir.1984)). Under the circumstances and given the fact that Sasson accompanied Ryan to each and every one of the five drug transactions, a reasonable juror could very easily conclude that

Sasson was there to serve as a "lookout" and to see that the drug deals were successfully completed, justifying the logical inference that Sasson was an active participant in the conspiracy. *Cf. Brigham,* 977 F.2d at 319 (holding that evidence was sufficient to support the conspiracy conviction where defendant showed up on short notice with a drug dealer, conferred with the drug dealer, waited in the parking lot and motel lobby and looked nervous and ill at ease while the drug dealer met with an undercover agent, and later took up a position where he could observe the trunk of the undercover agent's car from which ten kilograms of cocaine was about to be retrieved). Additionally, telephone records reflect that Ryan telephoned the McNeil residence, where Sasson frequently resided, at about the same time he was negotiating the terms of drug deals with Agent Sandford, suggesting that Sasson had some control over the distribution of narcotics. Finally, a note found in Sasson's car listed shares of profit among Ryan, Sasson and two others (with Ryan and Sasson designated as having equal shares), clearly evidencing Sasson's active participatory role in the drug conspiracy.

Sasson argues that there was no direct credible evidence of his involvement in the offense and that "the jury was asked to engage in assumption and guesswork" which it was not entitled to do. Sasson claims that the government had established only that he had a valid driver's license and Ryan did not, and that he was giving Ryan rides. Sasson's arguments cannot succeed because, for the purpose of argument only, even if the government's case is primarily circumstantial, such evidence is "as pertinent as direct evidence to the establishment of guilt or innocence." *United States v. Redwine,* 715 F.2d 315, 319 (7th Cir.1983), *cert. denied,* 467 U.S. 1216, 104 S.Ct. 2661, 81 L.Ed.2d 367 (1984) (quoting *United States v. Cogwell,* 486 F.2d 823, 828 (7th Cir.1973), *cert. denied,* 416 U.S. 959, 94 S.Ct. 1975, 40 L.Ed.2d 310 (1974)). As we have stated before:

In a case hinging on circumstantial evidence, while it is important that we not permit a verdict based solely on the piling of inference upon inference, ... it is also

imperative that we not rend the fabric of evidence and examine each shred in isolation; rather, the reviewing court must use its experience with people and events in weighing the chances that the evidence correctly points to guilt against the possibility of innocent or ambiguous inference.... These observations are especially relevant to proof of conspiracy, the principal crime charged here. Because of the secretive character of conspiracies, direct evidence is elusive, and hence the existence and the defendant's participation can usually be established only by circumstantial evidence....

*Perry,* 747 F.2d at 1169 (internal quotations and citations omitted). In any event, the government's case against Sasson consisted of not only circumstantial but also direct evidence, including but not limited to Ryan's identification of Sasson as his partner by gesture, taped conversation between Agent Sandford and Ryan implicating Sasson as being Ryan's partner, the note found in Sasson's car listing his share of profits, Sasson's presence at all five drug transactions as well as the Carriage Way Pharmacy on the date and at the approximate time of the theft of controlled substances, and telephone records evidencing that Ryan made contemporaneous calls to Sasson while negotiating the terms of the drug deals with Agent Sandford. The circumstances surrounding the five transactions permit the reasonable inferences that Ryan and Sasson acted in concert in stealing controlled substances from the Carriage Way Pharmacy, that Ryan conferred with Sasson as to the terms of the drug deals, that Sasson served as a "lookout" at the drug transactions, that he lied to a police officer as to why he was present at a particular transaction, and that he stood to profit from the fruits of the illegal business. "Judges in the federal system, whether they are in the trial or appellate system, do not operate in a vacuum, shielded from knowledge of drug operations in the real world." *Id.* In light of the substantial direct and circumstantial evidence in the record before us, we hold that a reasonable juror could conclude beyond a reasonable doubt that Sasson knew about, joined, and actively participated in the conspiracy to distribute controlled substances.

 Once the jury found that Sasson was a member of the drug conspiracy, it was entitled to convict Sasson on the five underlying drug transactions that his coconspirator Ryan conducted with Agent Sandford. *See* 18 U.S.C. § 2.[10] Under the doctrine set out by the Supreme Court in *Pinkerton v. United States,* 328 U.S. 640, 646–47, 66 S.Ct. 1180, 1183–84, 90 L.Ed. 1489 (1946), a defendant is responsible for a substantive offense committed by his coconspirator if the coconspirator's act was done in furtherance of the conspiracy and was reasonably foreseeable by the defendant. *Id.* at 647–48, 66 S.Ct. at 1184; *United States v. Wesson,* 33 F.3d 788, 794 (7th Cir. 1994), *cert. denied sub nom. Steele v. United States,* —— U.S. ——, 115 S.Ct. 773, 130 L.Ed.2d 668 (1995); *United States v. Williams,* 31 F.3d 522, 526 (7th Cir.1994). That is, Sasson can be convicted of the five distribution counts underlying the drug conspiracy if the transactions actually conducted by his coconspirator Ryan were reasonably foreseeable to him. All five drug transactions were reasonably foreseeable to Sasson; he drove Ryan to each and every one of the transactions, engaged in counter-surveillance, and stood to receive a share of the illicit profits. The jury obviously listened to, and weighed the credibility of, the respective witnesses. Being sophisticated and well-informed, the jury refused to believe that Sasson was just an innocent bystander or that he just happened to appear at the five drug sales; it reasonably inferred from the evidence before it that Sasson was a willing participant in the drug conspiracy. Thus, we will not overturn the jury's verdict on the distribution counts.

## C. Sasson's Sentence

### i. Calculation of Drug Amount under U.S.S.G. § 2D1.1

 Sasson argues that his Fifth Amendment right to due process was violated when

---

**10.** 18 U.S.C. § 2 provides:

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

the district court used the gross weight of the Dilaudid tablets, rather than the weight of the hydromorphone contained in the tablets, to calculate his sentence. We review Sasson's due process challenge *de novo* because it involves a pure legal question. *United States v. Tucker*, 20 F.3d 242, 243 (7th Cir.1994). Sasson does not contest that this Circuit and six other Circuits have interpreted the statutory scheme, *see* 21 U.S.C. § 841(b)(1)(C), as well as the Sentencing Guidelines, to authorize calculation of sentences based on the gross weight of Dilaudid tablets. *See, e.g., Lacour*, 32 F.3d 1157 (interpreting 21 U.S.C. § 841(b)(1)(C); holding that a defendant's sentence should be based on the gross weight of Dilaudid tablets); *United States v. Crowell*, 9 F.3d 1452, 1454 (9th Cir.1993) (stating that the general Guideline principle under U.S.S.G. § 2D1.1 is that drug quantity includes the entire weight of any mixture containing a detectable amount of controlled substance; holding that the gross weight of Dilaudid tablets, rather than the weight of the active ingredient contained in the tablets, is the proper measure of drug quantity), *cert. denied*, — U.S. —, 115 S.Ct. 138, 130 L.Ed.2d 79 (1994); *see also United States v. Landers*, 39 F.3d 643, 647 (6th Cir.1994) (collecting cases); *United States v. Blythe*, 944 F.2d 356, 363 (7th Cir. 1991) (holding that it was not plain error to calculate defendant's sentence based on the gross weight of Dilaudid tablets).

Instead, Sasson argues that the sentencing scheme lacks rational basis and leads to arbitrary punishment because Dilaudid tablets are manufactured with different doses of hydromorphone, a Schedule II controlled substance, *see* 21 U.S.C. § 812, and "neither the comparative harmfulness of the drug, the scope of its distribution, nor its dollar value can be determined by the gross weight." Sasson continues his due process argument stating that the penalty scheme is irrational because those selling different quantities of the active component, and therefore, with different degrees of culpability, will be subject to the same sentence range.

Besides the fact that Sasson's arguments mirror those already rejected by this court, as well as other circuits, in the context of statutory and guideline interpretations, the Supreme Court has rejected a similar Fifth Amendment challenge.[11] In *Chapman v. United States*, 500 U.S. 453, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991), a case involving lysergic acid diethylamide (LSD), the Supreme Court held that a sentencing scheme that calculates a defendant's sentence according to the combined weight of the active ingredient and its carrier medium (such as blotter paper) is rational and does not violate the Due Process Clause of the Fifth Amendment. In considering the Anti–Drug Abuse Act of 1986, which was intended to punish severely large-volume drug traffickers at any level, the Court found that Congress had a rational basis in assigning more severe penalties to the distribution of larger quantities of drugs regardless of their purity.[12] *Id.* at 464–65,

11. In fact, courts have uniformly rebuffed constitutional challenges to statutes that make punishment depend on gross rather than net weight. *See United States v. Marshall*, 908 F.2d 1312, 1322 n. 8 (7th Cir.1990) (en banc) (collecting cases), *aff'd by Chapman*, 500 U.S. 453, 111 S.Ct. 1919, 114 L.Ed.2d 524.

12. In our en banc decision affirmed by the Supreme Court, we have also made the same kind of analysis:
 Both the statute and the guidelines make the sentence increase with quantity. The greater the quantity, the greater the sentence. This is a rational way to proceed. Whether the potential created by failure to adjust for purity will be realized depends not only on the range of purity that actually occurs but also on what can be done about the extreme cases.... Do we see major suppliers of LSD skipping out the courthouse door because their pure drug falls

outside the mandatory minima ...? Do we see people going to jail for ten years because they sold one dose of LSD in a soft drink? If we don't, then the potential for disparity does not require holding statute and guidelines unconstitutional.
 *Marshall*, 908 F.2d at 1322. We concluded in *Marshall* that in the broad middle ground of retail and wholesale sales, LSD almost is always sold in the same kind of carrier medium, blotter paper. Similarly, in the case at bar, counsel has not called to our attention, nor are we aware of any, prosecutions for the sales of pharmaceutical Dilaudid tablets that present such extreme cases as suggested in *Marshall*. In fact, as counsel suggested, the dosages contained in similarly sized pharmaceutical Dilaudid tablets do not vary greatly; the tablets usually contain two to four milligrams of hydromorphone.

111 S.Ct. at 1927–28. "This is as true with respect to LSD as it is with respect to other drugs." *Id.* Although the controlled substance at issue in *Chapman,* namely LSD, was not sold by weight, but by dose, and did not have a carrier medium that diluted the drugs, the Court found that Congress can nevertheless include the weight of the medium in the drug quantity because the medium is used to "facilitate the distribution of the drug." *Id.* at 465, 111 S.Ct. at 1928 (stating that "[the carrier medium] is a tool of the trade for those who traffic in the drug, and therefore it was rational for Congress to set penalties based on this chosen tool."). The Court also noted that by setting penalties according to the gross weight of the drugs, Congress reasonably sought to avoid arguments about the accurate weight of pure drugs. *Id.*

▮ *Chapman* applies with equal force to the case at bar. Although unlike "street drugs," Dilaudid is prepared by manufacturers, and could not be diluted by drug dealers to create more sales, the distinction has no legal significance—the purpose of the "gross-weight rule" was not "to protect consumers of illegal drugs from being defrauded by unscrupulous dealers who would sell them a product more diluted than they have bargained for." *Crowell,* 9 F.3d at 1454; *United States v. Shabazz,* 933 F.2d 1029, 1032 (D.C.Cir.), *cert. denied sub nom., McNeil v. United States,* 502 U.S. 964, 112 S.Ct. 431, 116 L.Ed.2d 451 (1991). Sasson made the choice of using the tablets to distribute hydromorphone, and the inert ingredients in the tablets, regardless of their quantity, serve to facilitate such distribution, justifying their inclusion in the drug quantity. *See Crowell,* 9 F.3d at 1454. As we have stated before, "[d]istributors pick their poison. The penalties are plain for all to see. They decide what drug to peddle, on what medium." *Marshall,* 908 F.2d at 1325. "Congress is not required to adopt a criminal code with all possibility for unjust variation extirpated," and "[c]riminals have no constitutional right

to equal or entirely proportional treatment." *Id.*

▮ Moreover, Dilaudid presents an even more compelling case for inclusion than LSD because its active ingredient, hydromorphone, is diffused throughout the tablets and cannot be easily separated from the carrier medium. *See* Physicians' Desk Reference 413 (45th ed. 1991) (illustrating tablets); *Shabazz,* 933 F.2d at 1032. To arrive at the accurate weight of pure drugs would require courts to involve themselves with the details of dilution ratios and carrier mediums, a situation Congress justifiably sought to avoid. Constitutional law is not a device allowing judges to get involved in prescribing drug ratios and setting the "just price" of crimes. *Marshall,* 908 F.2d at 1326; *see also United States v. Rose,* 881 F.2d 386, 388 (7th Cir.1989) ("The Constitution has not been interpreted to require that the pattern of punishments for different federal crimes compose a harmonious whole.... It has never been considered a feasible judicial undertaking to rationalize, to codify—realistically, to rewrite—the federal criminal code in order to make it the product of a single mind, or of a single overarching conception of rational punishment...."). Once a defendant's guilt is proven beyond a reasonable doubt at a criminal trial conducted in accordance with the relevant constitutional guarantees, the court must impose whatever punishment that is authorized by statute for his offense, so long as the penalty is not based on an arbitrary distinction.[13] *See Chapman,* 500 U.S. at 465, 111 S.Ct. at 1927–28. The sentencing scheme of using the gross weight of Dilaudid tablets to calculate a defendant's sentence has a rational basis and is not arbitrary. The district court properly imposed a term of imprisonment based on the sentencing scheme authorized by the relevant statutes and guideline provisions. Accordingly, we will not disturb the 150 month prison term.

#### ii. Sasson's Supervised Release Term

▮ Finally, Sasson challenges the district court's imposition of a ten year term of

---

13. Of course, the penalty also cannot be cruel or unusual. *See Chapman,* 500 U.S. at 465, 111 S.Ct. at 1927–28; *McMillan v. Pennsylvania,* 477

U.S. 79, 92 n. 8, 106 S.Ct. 2411, 2419 n. 8, 91 L.Ed.2d 67 (1986).

supervised release. The government concedes that under § 5D1.2 of the Sentencing Guidelines, Sasson should have been given a supervised release term of no more than five years. The district court failed to elucidate its reasoning for imposing the ten-year term. Based upon the record before us which is barren of an explanation for the upward departure, we are of the opinion that the length of the term of Sasson's supervised release was unauthorized. Sasson's offense involved both Schedule II and Schedule III controlled substances. The statute provides for a term of supervised release of at least 3 years or 2 years depending on whether the controlled substance is in Schedule II or III. *See* 21 U.S.C. § 841(b)(1)(C) & (D). Under § 5D1.2 of the sentencing guidelines, if a defendant is convicted under a statute that requires a term of supervised release, "the term shall be at least three years but not more than five years, or the minimum period required by statute, whichever is greater." Thus, the maximum supervised release term Sasson could receive under U.S.S.G. § 5D1.2, and consistent with the statutory sections, is five years. A term of ten years, therefore, was an upward departure from the guidelines, requiring advance notice to the defendant and explanation for the departure. *See Burns v. United States*, 501 U.S. 129, 138–39, 111 S.Ct. 2182, 2187, 115 L.Ed.2d 123 (1991); *United States v. Amaechi*, 991 F.2d 374, 379 (7th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 2980, 125 L.Ed.2d 677 (1993); *United States v. Pico*, 966 F.2d 91, 92 (2d Cir.1992). *See also* 18 U.S.C. § 3553(b) & (c)(2) (when departing from the guidelines, the district court is required to "state in open court ... the specific reason for the imposition of a sentence different from that described."). Neither notice nor adequate explanation on the record was given by the district court for this aspect of the sentence. We, therefore, remand this matter to the district court for resentencing. *See Amaechi*, 991 F.2d at 379. Should the district court find circumstances justifying an upward departure, it remains free to do so on remand by giving notice to the defendant of its intent to depart and by setting forth the reasoning for the departure on the record. *See id.; Pico*, 966 F.2d at 92; 18 U.S.C. § 3553.

### III. Conclusion

The conviction of Leonard Sasson and the 150 month term of imprisonment imposed by the district court are AFFIRMED. The case is REMANDED to the district court for resentencing only as to the length of the term of supervised release.