**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Theresa L. SCOTT, Defendant–Appellant.**

No. 96–3240.

United States Court of Appeals,
Seventh Circuit.

Argued May 14, 1997.

Decided May 13, 1998.

---

Peter Witte, Law Student (argued), Kenneth M. Hays, Office of the United States Attorney, South Bend, IN, for Plaintiff–Appellee.

Mark H. Kusatzky (argued), Chicago, IL, for Defendant–Appellant.

Before CUMMINGS, COFFEY and DIANE P. WOOD, Circuit Judges.

COFFEY, Circuit Judge.

On March 8, 1996, a jury convicted the defendant-appellant, Theresa L. Scott ("Scott"), on seven counts stemming out of two separate murder-for-hire schemes conceived to kill her former lover, Donald Hogan ("Hogan"). Specifically, Scott was convicted on two counts of conspiring to use interstate commerce facilities for the commission of murder-for-hire in violation of 18 U.S.C. § 1958(a), two counts of aiding and abetting travel in interstate commerce in the commission of murder-for-hire in violation of 18 U.S.C. § 1958(a) and 18 U.S.C. § 2, and three counts of using interstate commerce facilities for the commission of murder-for-hire in violation of 18 U.S.C. § 1958(a).

At the sentencing hearing, the trial judge grouped Scott's various offenses under the United States Sentencing Guidelines ("U.S.S.G."), section 3D1.2(b) and assigned her a base offense level of thirty-two. The judge then determined that Scott's pursuit of two separate murder-for-hire contracts warranted an increase in the base level offense by two levels yielding an adjusted offense level of thirty-four. In so doing, the judge found that Scott's hiring of consecutive murder contracts fell outside the "heartland" of cases considered under section 3D1.2(b). The court sentenced Scott to 211 months incarceration, imposed a fine of $20,000, and ordered her to pay a $350 special assessment. Scott appeals both the final judgment and the sentence. We affirm.

## I. BACKGROUND

Scott and Hogan met in Indiana in the fall of 1990. The two engaged in an extramarital affair which lasted some five years. Hogan fathered two of Scott's children, and visited Scott on numerous occasions. Hogan presented Scott with a variety of expensive gifts, including automobiles and jewelry, and beginning in 1992, purchased two life insurance policies valued at $650,000, which designated Scott as the beneficiary. During the relationship, Hogan also purchased several properties and named Scott a joint tenant in ownership.

In early 1994, Scott began to lose interest in Hogan. Presumably to benefit from the valuable life insurance policies Hogan had purchased, Scott decided to have Hogan killed and launched the first of two murder-for-hire schemes in the fall of 1994. Scott approached Tomas Alvarez ("Alvarez") in October of 1994, proposing that Alvarez kill Hogan. In exchange, Scott offered to pay Alvarez $75,000 of the proceeds of the life insurance policies she intended to collect upon Hogan's death. After confirming that she was the beneficiary of the life insurance policies, Scott directed Alvarez to proceed with the murder scheme. She provided Alvarez with Hogan's business card and photograph. To avoid suspicion, Scott instructed Alvarez to carry out the killing in a manner that would cause police to conclude that the murder had resulted from a botched robbery.

In June of 1995, Alvarez drove from South Bend, Indiana, to Posen, Illinois, where Hogan's business was located, to commit the murder. In Posen, police officers stopped Alvarez after noticing that his vehicle license plates were stolen. A check of Alvarez's record revealed an outstanding arrest warrant in the state of Florida. Posen police arrested Alvarez and incarcerated him at the Cook County Jail until July of 1995. During his confinement, Alvarez attempted to "subcontract" Hogan's murder to his cell mate, Jeffrey Pritchett ("Pritchett"). Alvarez was not aware that Pritchett, although a gang member, worked regularly with the Chicago Police Department ("CPD") as an informant. Alvarez placed two telephone calls to Scott, informing her of his continued efforts and

requesting that she post his bond. Scott refused, apparently unconvinced of Alvarez's ability to complete the crime.

In light of her dissatisfaction with Alvarez's work, Scott initiated the second of the two murder-for-hire schemes in September of 1995. Scott contacted Melvin Bridges ("Bridges") and offered him $5,000 as a down payment for the murder, and $75,000 upon Hogan's death.[1] Bridges agreed and Scott supplied him with Hogan's name, business address, and photograph.

On September 14, 1995, Bridges traveled from South Bend to Chicago. However, instead of following through with the murder scheme, Bridges contacted Hogan to warn him about the contract on his life. Bridges left a message at Hogan's business, instructing Hogan to return his call.

Bridges returned to South Bend, where Hogan reached him. Although initially suspicious of Bridges's warning, Hogan ultimately accepted the murder conspiracy as truth. Bridges kept Scott's down payment and abandoned the conspiracy; Alvarez's efforts, however, continued.

After Alvarez and Pritchett were released from prison, Pritchett informed the CPD of Scott's murder conspiracy in October of 1995. Due to the interstate nature of the allegations against Scott, the CPD coordinated its efforts with the Bureau of Alcohol, Tobacco and Firearms ("ATF"). Pritchett provided information concerning Alvarez's offer to pay for the killing, Hogan's identity, and Scott's motive to collect the insurance proceeds.[2]

In November of 1995, the ATF recorded several telephone conversations between Pritchett and Alvarez. The two discussed details of the murder conspiracy plan. On November 21, 1995, the ATF filed a criminal complaint against Alvarez and apprehended him in South Bend, Indiana. Alvarez gave a videotaped confession detailing his part in Scott's scheme to kill Hogan. The ATF then informed Hogan of the murder-for-hire plan, and Hogan revealed Scott's identity.

Later the same day, Alvarez agreed to assist the investigators in apprehending Scott. In a taperecorded telephone conversation from the South Bend Police Department, Alvarez falsely informed Scott that preparations for Hogan's murder were complete. He asked, "How do you want this done?" Scott replied, "You know." Alvarez then asked, "You want him dead?" Scott was quiet for several seconds before asking him where he was calling from. The next morning, Alvarez made another tape-recorded call to Scott, this time falsely informing her that Hogan was dead. Scott responded that she did not know what Alvarez was talking about. Meanwhile, the ATF prepared a criminal complaint against Scott, and received a warrant for her arrest. On November 22, 1995, the ATF arrested Scott and transported her to the South Bend Police Department. After receiving her *Miranda* warnings, Scott waived her right to remain silent and have counsel present, and prepared a two-and-a-half page handwritten confession, detailing her conspiracy.

On December 7, 1995, a grand jury returned an indictment against Scott asserting violations of 18 U.S.C. § 1958(a), which provides in relevant part:

> Whoever travels in or causes another … to travel in interstate … commerce, or uses or causes another … to use … any facility in interstate … commerce, with intent that a murder be committed … as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, or who conspires to do so, shall be fined … or imprisoned for not more than ten years, or both….

On March 8, 1996, a jury found Scott guilty on seven counts named against her in the indictment, five of which concerned the Alvarez conspiracy, and two of which concerned the Bridges conspiracy. At the sentencing

1. At the same time, Scott spoke with Hogan and requested that he wire her $9,000, ostensibly for the purpose of buying a new motorcycle. On September 12, 1995, as requested, Hogan wired her the $9,000. Scott used $5,000 of the $9,000 as a down payment on Hogan's own death.

2. Pritchett was able to identify Scott only by context, not by name. At this time, Scott's identity was unknown to the coordinated investigation team.

hearing on September 3, 1996, the district court rejected the "unit" approach adopted by the presentencing report which recommended grouping the five Alvarez counts and the two Bridges counts separately. *See* U.S.S.G. § 3D1.4. Instead, the court agreed with Scott that all seven counts should be grouped together pursuant to U.S.S.G. § 3D1.2(b), thereby yielding a base criminal offense level of 32. *See* U.S.S.G. § 2E1.4. The court then denied Scott's request for a two-level reduction based on acceptance of responsibility under U.S.S.G. § 3E1.1(a) and instead imposed a two-level increase attributable to Scott's leadership role in the Alvarez conspiracy pursuant to U.S.S.G. § 3B1.1(c). In addition, the district court granted the Government's request, as detailed in the presentencing report, for an upward adjustment on the theory that Scott's entrance into two separate contracts for the murder of a single victim rendered her case atypical and outside the "heartland" of cases considered by the Commission in formulating the grouping rule under U.S.S.G. § 3D1.2(b). The district court imposed a sentence of 211 months, a fine of $20,000, and a special assessment of $350.

## II. ISSUES

Scott appeals both the trial court's final judgment and sentence. Specifically, Scott argues that: (1) the Government failed to provide sufficient evidence for the jury to find beyond a reasonable doubt that she committed the necessary elements of the crimes charged; (2) the district court erred in denying her motion for a two-level reduction under U.S.S.G. § 3E1.1(a) based on her acceptance of responsibility for the crimes; (3) the trial judge erred in departing upward two levels because her conduct was not considered adequately by the Sentencing Commission in its formulation of U.S.S.G. § 3D1.2(b); and (4) the district court violated her Sixth Amendment right to confront the witness Alvarez, and this violation did not constitute harmless error.

## III. DISCUSSION

*A. Sufficiency of the Evidence*

■ "In challenging the sufficiency of the evidence to support [a] conviction[ ], [the de-fendant] bears a heavy burden...." *United States v. Hill,* 40 F.3d 164, 166 (7th Cir.1994). Evidence of the conviction is reviewed in a light most favorable to the prosecution. *See United States v. Carraway,* 108 F.3d 745, 750 (7th Cir.1997) (citing *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). Reversal is appropriate " 'only when the record is *devoid of any evidence, regardless of how it is weighed, from which a jury could find guilt beyond a reasonable doubt.*' " *United States v. Edwards,* 77 F.3d 968, 973 (7th Cir.1996) (quoting *United States v. Berchiolly,* 67 F.3d 634, 637 (7th Cir.1995) (emphasis added)). We must consider "whether ... any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Berchiolly,* 67 F.3d at 638 (citation and internal quotation omitted). As a result, this Court will only reverse when "no reasonable jury could have found the defendant guilty of the charged offense beyond a reasonable doubt." *United States v. Alcantar,* 83 F.3d 185, 189 (7th Cir.1996) (citation omitted).

■ Questions of witness credibility typically rest with the jury, not the court. *See Carraway,* 108 F.3d at 750. Appellate courts do not "second-guess" a jury's credibility determination, *see United States v. Lakich,* 23 F.3d 1203, 1210–11 (7th Cir.1994) (quotation omitted), but rather grant considerable deference to the jury. *See United States v. Yusuff,* 96 F.3d 982, 987 (7th Cir.1996) (citation omitted). To succeed on appeal, a defendant must show that testimony was incredible, or contrary to the laws of nature or unbelievable on its face. *See Alcantar,* 83 F.3d at 189 (citations omitted). "Testimony is not incredible as a matter of law ... only because the witness may have been impeached by certain discrepancies in his story, by prior inconsistent statements, or by the existence of a motive to provide evidence favorable to the government." *Id.* Consequently, a defendant's appellate attack on witness credibility will seldom succeed. *See id.*

■ Scott challenges the testimony of Alvarez and Bridges by claiming that their

account of the facts lacks credence due to inconsistencies. While Scott's arguments may not be an outright attempt to reargue the facts already decided by the jury, she appears to be asking this Court to reassess the credibility of the testimony already accepted by the jury. The defendant offers no explanation as to why these considerations were not the "routine sort of credibility question[s] that lie[ ] within the province of the jury to sort out." *Carraway,* 108 F.3d at 752. In considering the trial court evidence in a "light most favorable" to the Government, we must "credit[ ] the witnesses against [the defendant]." *Id.* at 750.

The federal murder-for-hire statute makes it unlawful to: (1) travel in or cause another to travel in interstate commerce as part of a murder-for-hire; or (2) use the mail or "any facility in interstate ... commerce" (e.g., telephones) in connection with a murder-for-hire; or (3) conspire to do either of these things. 18 U.S.C. § 1958(a). Our review of the record reveals that the Government introduced not merely sufficient, but substantial evidence supporting the jury's rational finding that Scott was guilty beyond a reasonable doubt. Regarding count 1, that Scott conspired with Alvarez to cause travel in interstate commerce with the intent that a murder-for-hire be committed, Alvarez testified that he entered into an agreement with Scott to kill Hogan in exchange for $75,000. Alvarez further noted that he recruited Pritchett into the conspiracy, and that he informed Scott of the recruitment in a telephone conversation from the Cook County Jail in Illinois, to Indiana. Scott's own confession corroborates Alvarez's testimony concerning his arrangements with Scott in conspiring to murder Hogan. With respect to the second count, that Alvarez traveled interstate to commit murder-for-hire, Alvarez testified that had Scott not offered to pay him $75,000 to kill Hogan, he would not have traveled across state lines to Illinois from Indiana on June 21, 1995.

Recordings of telephone conversations between Alvarez in Indiana and Pritchett in Illinois convinced the jury that Scott caused Alvarez to use interstate communications facilities to accomplish Hogan's murder, as alleged in counts 4, 6 and 8 of the indictment. The jury heard taped recordings of the interstate telephone conversations between Alvarez and Pritchett in which the two discussed their plans to murder Hogan. Alvarez also told the jury that had Scott not offered him $75,000, he would not have discussed Hogan's murder with Pritchett.

Counts 10 and 11 concern Scott's murder-for-hire arrangements with Bridges. Bridges's testimony that Scott gave him $5,000 for the murder of Hogan was corroborated by Scott's own confession and by the testimony of an agent of the ATF. This evidence persuaded the jury that Scott caused Bridges to travel in interstate commerce with the intent of committing Hogan's murder. Scott maintains that it would "not make any sense to a rational trier of fact" to accept Bridges's contention that he drove 100 miles beyond Posen in order to telephone Hogan. Scott therefore argues that Bridges's testimony that he traveled to Chicago only to make a telephone call to Hogan before returning to South Bend is "incredible" as a matter of law. However, this Court has determined that in order for testimony to be considered "incredible," "it must have been either physically impossible for the witness to observe that which he or she claims occurred, or impossible under the laws of nature for the occurrence to have taken place at all." *United States v. Dunigan,* 884 F.2d 1010, 1013 (7th Cir.1989) (citation omitted). Because Bridges's testimony does not satisfy either criterion, it is not "incredible," and thus, Scott's contention is erroneous.

## B. The Defendant's Acceptance of Responsibility

Scott next contends that the district court erred in refusing to grant her a two-level downward adjustment of her base offense level, despite the fact that she accepted responsibility for her actions. Scott argues that the court's refusal runs contrary to the dictates of the Sentencing Guidelines, which provide that a defendant who "clearly demonstrates acceptance of responsibility" for her actions will be eligible for a two-level decrease in base offense level. U.S.S.G. § 3E1.1(a). The trial judge denied Scott's

request because he determined that Scott failed to admit her culpable conduct even after trial, despite her ability to do so. In fact, Scott only expressed remorse over her actions upon her incarceration.

■ Generally, "[w]hether a defendant has fully accepted responsibility for his offense is a finding of fact to be made by the trial court, and is based largely on the district judge's determinations regarding the defendant's credibility and conduct...." *United States v. Schaefer*, 107 F.3d 1280, 1289 (7th Cir.1997). As a result, this Court reviews trial court determinations concerning whether to credit a defendant for accepting responsibility under the deferential "clearly erroneous" standard. *See United States v. Boatner*, 99 F.3d 831, 839 (7th Cir.1996) (citation omitted). Defendants who fail to demonstrate that the district court's reasons for denying a reduction in base offense level were "without foundation" will not succeed on appeal. *See United States v. Panadero*, 7 F.3d 691, 694 (7th Cir.1993) (citation omitted).

Scott contends that due to the verdict's effect on her mental condition, she was unable to express remorse for her actions. Scott claims she is entitled to the reduction because in the interim, she has accepted responsibility to the extent of her ability. Scott relies on *United States v. Braxton*, 903 F.2d 292 (4th Cir.1990), overturned on other grounds, 500 U.S. 344, 111 S.Ct. 1854, 114 L.Ed.2d 385 (1991), to support her contention. In *Braxton*, the trial court denied a schizophrenic defendant's request for a reduction in offense level on the grounds that even though the defendant had accepted responsibility to the extent possible for assault and use of a firearm, he failed to rehabilitate himself after the crime. *See id.* at 295–96. The Fourth Circuit reversed as a matter of law, holding only that the district judge erred by taking rehabilitation into consideration in his decision. *See id.* at 296. Thus, the *Braxton* court did not hold that defendants who are incapable of fully accepting responsibility are entitled to a reduction, as Scott would have us believe. *See id.* That is, the Fourth Circuit ultimately did not reverse the district

court's refusal to grant the offense level reduction. *See id.*

The trial judge ruled that Scott was not entitled to the reduction in offense level because she neither admitted guilt nor "expressed remorse about anything other than her imprisonment," and we agree. After initially admitting her involvement in the Alvarez and Bridges conspiracies, Scott denied guilt by seeking to suppress the confession, claiming she could not remember the substance of her oral and written statements to the police. Scott's denial is typical of behavior which is excluded from protection under section 3E1.1 of the Guidelines. The offense level reduction "is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." U.S.S.G. § 3E1.1, Application Note 2. Also, Scott's pretrial statements and conduct belie her supposed acceptance of responsibility. Scott attempted to disassociate herself from Alvarez after her pre-trial release, she failed to surrender voluntarily or cooperate with police, she took no steps towards rehabilitation, and she made no restitution. Furthermore, Scott put the Government to its proof at trial, maintaining her innocence throughout. District courts will rarely grant an offense level reduction to a defendant who goes to trial. *See United States v. Corral–Ibarra*, 25 F.3d 430, 439–40 (7th Cir.1994). "The reduction for a timely acceptance of responsibility was not adopted with the idea that a defendant might lessen his or her sentence with a last minute, formalistic demonstration of remorse after the government has been forced to expend a great deal of time and resources in gathering an overwhelming case." *United States v. Tolson*, 988 F.2d 1494, 1499 (7th Cir.1993) (citation omitted).

## C. *The Upward Departure*

■ Scott does not dispute the district court's decision to group her convictions under section 3D1.2(b) of the Sentencing Guidelines. Section 3D1.2(b) requires that the sentencing judge group each conspiracy involving "the same victim and two or more

acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan." However, Scott contends that the trial judge erroneously imposed a two-level upward departure of her base offense level after finding that her conduct fell outside of the "heartland" of cases considered under U.S.S.G. § 3D1.2(b).

 This Court reviews the district court's decision to depart from the Guidelines under an abuse of discretion standard. *See Koon v. United States*, 518 U.S. 81, 98–102, 116 S.Ct. 2035, 2047–48, 135 L.Ed.2d 392 (1996). "A district court abuses its discretion when it makes an error of law." *United States v. Carter*, 122 F.3d 469, 472 (7th Cir. 1997) (citation omitted). "We accept the district court's findings of fact supporting the departure unless clearly erroneous." *United States v. Otis*, 107 F.3d 487, 490 (7th Cir. 1997) (citation omitted). This conclusion is based on the determination that trial judges are better equipped to assess the fact-specific circumstances of a sentence; "[d]istrict courts have an institutional advantage over appellate courts in making these sorts of determinations, especially as they see so many more Guidelines cases than appellate courts do." *Koon*, 518 U.S. at 98, 116 S.Ct. at 2047.

 In considering offense level departures, the district court examines the offense for factors "of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission...." *Id.*, 518 U.S. at 92, 116 S.Ct. at 2044. Where a defendant's conduct springs from aggravating or mitigating circumstances that differ significantly from the norm considered by the Sentencing Commission, a court may consider whether that conduct is sufficient to take the case "out of the Guideline's heartland." *Id.*, 518 U.S. at 96, 116 S.Ct. at 2045. Specifically:

> The Commission intends the sentencing courts to treat each guideline as carving out a "heartland," a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the

court may consider whether a departure is warranted.

U.S.S.G., Ch. 1, Pt. A, 4(b). For example, because the robbery sentencing guideline does not consider harm to more than one victim, departure would be warranted if several persons suffered injury as a result of a single robbery. U.S.S.G. § 5K2.0. Similarly, a multiplicity of different offenses or the systemic nature of a particular scheme may warrant an upward departure. *See United States v. Hogan*, 54 F.3d 336, 341 (7th Cir. 1995). Furthermore, no rigid rule exists for computing an upward departure. *See United States v. Tai*, 41 F.3d 1170, 1176 (7th Cir.1994). The law merely requires that district judges link the degree of departure to the structure of the Guidelines and justify the extent of the departure taken. *See United States v. Horton*, 98 F.3d 313, 319 (7th Cir.1996). To make its assessment, the district judge need only draw an analogy between the defendant's actions and the conduct discussed in the Guidelines. *See id.* at 317.

In the case under consideration, Scott challenges only the validity of the trial court's departure, and not its extent. Scott maintains that the facts of her case were not "sufficiently unusual to justify a departure." The district judge concluded that an upward departure was appropriate because the second conspiracy was not the type of circumstance considered adequately by the Sentencing Commission in its formulation of the Guidelines. The judge analogized Scott's conduct to offenses contemplated in Application Note 4 to section 3D1.2 of the Guidelines. The "heartland" of this provision considers a "single course of conduct with a single criminal objective" and does not authorize the grouping of offenses that do not represent essentially one composite harm. *See* U.S.S.G. § 3D1.2, Application Note 4. For example, robbery of the same victim on separate occasions would not be grouped because each robbery involves separate instances of risk of harm. *See id.* Similarly, a sentencing court would not group the counts against a defendant convicted of two counts of rape for raping the same person on different days. *See id.*, Example 5. Thus, in our

case, the trial judge identified Scott's second conspiracy as a circumstance not adequately considered by the Commission. The district court drew this conclusion after finding that Scott's separate schemes created for the intended victim "separate instances of fear and risk of harm, not one composite harm." In determining whether Scott's actions fell outside the "heartland" of cases contemplated under the Guidelines, the trial court relied on the Sixth Circuit's reasoning in *United States v. Pittman*, 55 F.3d 1136 (6th Cir.1995). The *Pittman* court affirmed an upward departure of two levels for a defendant who hired an individual to murder two different victims. *See id.* at 1140. Finding that Scott's conduct was not identical to but mirrored that in *Pittman*, the court reasoned that Scott's first offense was complete after Alvarez drove to Posen with the intention of killing Hogan.[3] Different from the "companion substantive offenses" the Guidelines specifically address, the second conspiracy with Bridges represented a separate contract that created a second risk of harm, and therefore fell outside the "heartland" of cases contemplated by the Sentencing Commission.

On the contrary, Scott proposes that the separate conspiracies to murder Hogan constituted one composite harm within the Guideline's "heartland" of cases. Scott maintains that the analogy between her case and *Pittman* is weak, since the *Pittman* defendant sought to effectuate a *greater harm*: the murder of two people. A series of transactions to kill the same person, she contends, can cause no greater harm than one murder-for-hire conspiracy. Scott argues that because one person, Hogan, remained the intended victim, the hiring of Bridges was simply another try at the same crime after Alvarez's attempt failed. Scott's efforts, however, entailed more than "trying again." Scott "tried again" when she encouraged Alvarez, while in jail, to proceed

with the plan to kill Hogan. The Bridges conspiracy was an independent contract, and not another try, *because it flourished while Alvarez's "second try" was under way, and Alvarez was unaware of its inception.* Scott's decision to launch the Bridges plan was not a case of "trying again" after the first conspiracy had failed; by initiating a second conspiracy while the first remained viable, Scott simply tried twice as hard to arrange the death of Hogan, and Hogan was exposed to twice the risk of harm. The separate transactions enhanced the risk of harm because the likelihood that Hogan would be killed increased twofold. Application Note 4 prohibits the grouping together of certain counts involving episodic offenses. We therefore hold that the district judge did not abuse his discretion in finding that the second, independent and overlapping contract for the murder of Hogan removed Scott's case from the "heartland" of cases considered by the Commission in crafting section 3D1.2(b).

## D. Sixth Amendment Right of Confrontation

 Scott finally argues that the trial judge violated her Sixth Amendment right to confrontation by refusing to allow her to cross-examine the witness Alvarez concerning his drug habits. After eliciting information from Alvarez that during a tape-recorded conversation with Pritchett, Alvarez had been smoking marijuana, Scott's attorney asked whether "that [was] something [he] did normally?" The district court sustained a Government objection on relevance grounds. A short while later the court sustained the Government's objection when Scott's attorney asked Alvarez whether he received marijuana every day. Normally, this Court reviews a trial court's restriction on cross-examination for an abuse of discre-

---

**3.** Because *Pittman* represents a mirror image of Scott's case, the analysis under the Guidelines is significantly different. *Pittman* involved a departure from U.S.S.G. § 2A1.5, relating to conspiracies and solicitations to commit murder, and from section 2E1.4, governing violations of 18 U.S.C. § 1958, while Scott's case involves a departure from U.S.S.G. § 3D1.2(b), the guideline that requires forming a single group from differ-

ent criminal offenses, in this case multiple violations of 18 U.S.C. § 1958. The issue in *Pittman* was whether sections 2A1.5 and 2E1.4 anticipated more than one victim in interstate murder-for-hire schemes. The question here is whether U.S.S.G. § 3D1.2(b) adequately considered the possibility of parallel murder-for-hire contracts of a single victim.

tion. *See United States v. Sasson*, 62 F.3d 874, 882 (7th Cir.1995), *cert. denied*, 516 U.S. 1131, 116 S.Ct. 953, 133 L.Ed.2d 876 (1996) (citations omitted). However, where the restriction impacts the Sixth Amendment's right to confrontation, the review is *de novo*. *See id.*

■■■■ A criminal defendant has the right, as guaranteed by the Confrontation Clause of the Sixth Amendment, to "be confronted with the witnesses against him . . . ." U.S. Const. Amend. VI. "[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense may wish." *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15 (1985). "[W]hen deciding whether limitations of cross-examination are permissible, courts have striven to distinguish between the core values of the confrontation right and more peripheral concerns which remain within the ambit of the trial judge's discretion." *United States v. Nelson*, 39 F.3d 705, 708 (7th Cir. 1994) (citation and internal quotations omitted). So long as cross-examination elicits adequate information to allow a jury to assess a witness's credibility, motives, or possible bias, the Sixth Amendment is not compromised. *See Sasson*, 62 F.3d at 883. In determining whether the Sixth Amendment is implicated in a cross-examination denial, we focus on whether there was sufficient information presented to the jury for its appraisal of the witness. *See id.* at 882–83 (citation omitted). "[I]t is of peripheral concern to the Sixth Amendment how much opportunity defense counsel gets to hammer [a] point home to the jury." *Id.* at 882 (citation and internal quotation omitted). Mere restrictions on the scope of cross-examination do not constitute a constitutional error violating the Confrontation Clause in every case. *See Delaware v. Van Arsdall*, 475 U.S. 673, 682, 106 S.Ct. 1431, 1437, 89 L.Ed.2d 674 (1986). Furthermore, even a constitutionally improper denial of the Confrontation Clause is subject to harmless-error analysis and does not necessarily undermine the integrity of the original verdict. *See id.*, 475 U.S. at 684, 106 S.Ct. at 1438.[4]

■■■■ A trial judge retains wide latitude in his ability to impose reasonable limits on cross-examinations, and factors such as jury prejudice may restrict the defense's cross-examination of witnesses. *See Sasson*, 62 F.3d at 882. The Sixth Amendment was not compromised in this case because the district judge allowed Scott's attorney the opportunity to expose Alvarez's motives and biases. While failing to question Alvarez about the effects of drug use on his ability to recall facts, Scott's attorney illustrated weaknesses in Alvarez's memory, challenged Alvarez's capacity to recall events, and proposed motives that would cause Alvarez to lie. In probing Alvarez's biases, the defense asked Alvarez at length about his agreement with the Government, the promises the Government had made to him for his testimony, and the benefits Alvarez would receive for his cooperation. Moreover, the court allowed a number of questions concerning Alvarez's drug use. Alvarez responded to questions about his prior purchases of marijuana, his efforts to secure the drug from Pritchett, and his knowledge about its price. We cannot conclude that two sustained objections impaired the defense's ability to pursue its line of questioning, especially when weighed against the latitude given the defense to probe Alvarez's drug use generally, and the overwhelming evidence elicited against the defendant.

■■■■ Furthermore, even if we were to hold that the Sixth Amendment Confrontation Clause had been compromised, the overall result of the compromise would be harmless error. Balancing Alvarez's value as a prosecution witness, the cumulative impact of his testimony, the corroboration of his testimony in Scott's confession, the extent of

---

4. To determine whether a trial judge's evidentiary ruling was harmless error beyond a reasonable doubt, reviewing courts should inquire into the importance of a witness's testimony in the prosecution's case, consider whether the testimony was cumulative, weigh the presence or absence of corroborating or contradictory evidence, balance the extent of cross-examination permitted in general during the trial, and digest the overall strength of the prosecution's case. *See id.*

cross-examination allowed, and the overall strength of the Government's case, this Court holds that, beyond a reasonable doubt, the restrictions on Alvarez's cross-examination did not impact the overall verdict.

## IV. CONCLUSION

The trial court's ruling is affirmed because the law does not support Scott's contentions concerning the four issues presented on appeal. Initially, the Government presented sufficient evidence for a rational jury to find Scott guilty beyond a reasonable doubt. Second, the trial judge correctly concluded that Scott's acceptance of responsibility did not merit a reduction in her base offense level since Scott failed to admit guilt or express remorse for her crimes before, during or after her trial. Third, the trial judge had discretion to impose an upward departure of two levels on Scott's base offense since the nature of Scott's crimes are not adequately addressed by the Sentencing Guidelines. Finally, the restriction on Scott's cross-examination concerning Alvarez's use of drugs did not compromise Scott's Sixth Amendment rights because the defense previously had an opportunity to question Alvarez on a variety of topics, including his drug use.

AFFIRMED.