FLAUM, Circuit Judge.
In 1996, Thomas Manske was convicted by a jury of one count of conspiracy to distribute cocaine in violation of 21 U.S.C. § 846, and sentenced to 151 months in prison. Manske appealed, seeking a new trial based on limitations the district court placed on his cross-examination of the government’s key witnesses. Although we cannot definitively conclude that allowing him to make the prohibited inquiries would have changed the jury’s verdict, the exclusion of this information undermines our confidence in the outcome, and thus, Manske’s conviction is reversed.[1]
Facts
The defendant was indicted as part of an ongoing investigation of cocaine trafficking in northern Wisconsin. Before Manske’s trial, the government had persuaded Stephen Pszeniczka and Daniel Knutowski to plead guilty to charges including distribution of cocaine, and, with their cooperation, successfully prosecuted Patrick Menting and Dennis Tushoski for similar crimes. *772 See United States v. Menting, 166 F.3d 923 (7th Cir.1999); United States v. Knutowski, 165 F.3d 33 (7th Cir.1998) (unpublished order). Pszeniczka and Knutowski fingered Manske as their drug source — a contention Manske vigorously denied. At Manske’s trial, both men testified that between 1993 and 1996, the defendant was their primary supplier of cocaine. They claimed that Manske delivered one to two ounces of cocaine to them at a time, either to Knutowski’s home, or at various other locations, including a McDonald’s parking lot. According to Knutowski, these deliveries occurred nearly every Wednesday over the course of three years. Pszenicz-ka and Knutowski also testified that on two occasions, they received cocaine from Manske at his home. In sum, the two painted a fairly detailed and consistent picture of their dealings with the defendant. Pszeniczka and Knutowski alleged that Manske sold them 5.78 kilograms of cocaine during the three years he was their supplier.
This testimony made up the bulk of the government’s case, with the remainder supplied by tertiary witnesses. One of them, Mary Colburn, testified that on three occasions she either saw Manske deliver cocaine to Pszeniczka and Knutow-ski, or was nearby when such drug transactions occurred. Another witness, Jackie Campbell, had no direct knowledge of Manske’s involvement in drug deals, but was able to provide inculpatory details against the defendant that were consistent with Knutowski and Pszeniczka’s story. The government had no physical evidence to corroborate the witness testimony against Manske. There were no surveillance recordings implicating Manske, no cocaine found on his person or property, no money the government could trace to illegal drug transactions and no admissions by the defendant. The government presented telephone records showing calls between Manske and Knutowski, but because their lines were not wire-tapped the substance of the conversations was not identifiable.
Manske testified on his own behalf, acknowledging that he knew Knutowski and Pszeniczka. He also confessed to having engaged in illegal sports betting and bookmaking with them. According to Manske, the weekly Wednesday night meetings and phone calls between him and the two principal witnesses against him involved these gambling related activities. Like the government, Manske’s case relied on oral testimony; he had no physical or documentary evidence with which to exonerate himself. Thus, his defense strategy hinged entirely on destroying the credibility of the witnesses against him. Manske was able to impeach Knutowski, Pszenicz-ka, Colburn and Campbell with the fact that they were receiving leniency from the government in return for their testimony, and with their extensive history of drug use and drug dealing. Manske also sought to cross-examine Pszeniczka about past acts of witness intimidation which the government acknowledged had taken place, arguing that these acts were probative of Pszeniczka’s truthfulness. The defendant additionally expressed his desire to cross-examine other witnesses to explore whether they were biased against him and in favor of the government because they had previously been threatened by Pszeniczka or knew of these threats. Pursuant to a pre-trial motion in limine the district court barred the defendant from inquiring into these areas, thus keeping this evidence from the jury. Thus, the defendant was not able to delve into acts of witness intimidation and potential subornation of perjury which Pszeniczka had previously engaged in, nor was he able to ask Colburn and Campbell about occasions unrelated to his trial when Pszeniczka allegedly intimidated them and others into lying to law enforcement and in judicial proceedings.
After a three day trial, the jury retired for deliberations. Although the jury sent the district court a note that it was stalemated, it eventually convicted the defen *773 dant. Manske appealed, primarily on the grounds that the district court’s limitations on his cross-examination of government witnesses were improper.

Motion in Limine

Because it is at the center of the defendant’s appeal, we now return to the government’s pre-trial motion in limine, and give it a fuller explication.
No doubt sensing that the defendant would be eager to inquire into Pszeniczka’s background, the government made a pretrial motion in limine to prevent Manske from exploring certain areas at trial. This motion sought to block the defendant from introducing any evidence relating to threats Pszeniczka made to various witnesses who testified in a related case, United States v. Tushoski, CR-96-83-C (W.D.Wisc.1997).[2] The motion asked for limitations on Pszeniczka’s cross-examination as well as that of Colburn and Campbell. Although the government did not identify the particular threats it sought to exclude, it is apparent from reading the motion in limine and the defendant’s response to the motion which included the relevant portions of the transcript in Tush-oski, that the parties and the court were familiar with the subject matter.
What the government sought to keep out was mention of roughly half a dozen incidents where Pszeniczka, or people acting on his behalf, allegedly threatened potential witnesses in an effort to keep them from incriminating him. (Collectively, this is referred to as “the threat evidence.”) For example, an associate of Pszeniczka, Jeffrey Matter, gave a sworn statement averring that after having told the police that Pszeniczka was involved in drug dealing, Pszeniczka threatened him over the phone, and allegedly told him “if you don’t change your statement you might as well be dead. Either I’ll kill you or my friends will.” As his statement indicates, after the threat, Matter changed his story. When Pszeniczka found out about the changed story, he supposedly called Matter and said “if you go back to what you first said, I’ll put a cap in your head.” Similarly, another individual, Leslie Ostrowski, had testified in a previous trial that Pszeniczka confronted her and verbally threatened her for speaking to the police about his cocaine activities.
Yvonne Pospahala, who was also familiar with Pszeniczka, told a Wisconsin law enforcement officer that Pszeniczka came by her house asking for Mary Colburn on one occasion, and, when Pospahala told Pszen-iczka that Colburn had left town for fear of him, Pszeniczka allegedly said “good, if [Colburn] hadn’t [she’d] be dead.” Don Peeper, a customer and associate of Pszen-iczka, had previously testified that he lied before a grand jury at Pszeniczka’s urging and because of thinly veiled threats Pszen-iczka leveled at him. In addition, the defendant wanted to question Jackie Campbell about Pszeniczka’s statements to her about his mob connections and his willingness to use violence against people who “crossed him.” A final piece of relevant threat evidence, which the government alluded to in its own trial against Pszeniczka, was an incident where Colburn and her boyfriend Harold Johnson (who testified at Manske’s trial), found dolls with ropes around their necks hanging from a tree in Ms. Colburn’s front yard adjacent to signs saying “Nares Live Here” and “You’re Dead.” Apparently Colburn and Johnson took these to be threats from Pszeniczka warning them against their impending cooperation with the government against him.[3]
*774 The government’s argument for limiting cross-examination of Pszeniczka was that under Fed.R.Evid. 608(b),[4] this evidence related to specific instances of conduct not probative of truthfulness or untruthfulness. Rather than dealing with truthfulness (or a lack thereof), the government argued that the threat evidence only went to show Pszeniczka’s propensity for violence, and therefore could not be admitted. Manske responded by asserting that threats calculated to encourage people to break the law were in fact probative of Pszeniczka’s truthfulness or untruthfulness. As to the bias evidence, the government argued that it was irrelevant and a waste of time. The defendant countered that the threat evidence supported his theory that the prosecution’s case was based on an elaborate set-up relying on Pszenicz-ka’s testimony and bolstered by other witnesses telling similar tales because of their fear of contradicting him.
The district court granted the government’s motion in limine. The trial judge observed that FRE 608(b) did not allow Manske to use the threat evidence to cross-examine Pszeniczka because the threats “[did] not impact upon his credibility.” The court also stated that “the fact that there was a threat offered by Pszen-iczka does not go to his character for truthfulness,” but rather, to the “character [for] violence and [Pszeniczka’s] threatening nature.” Viewed in this light, the district court held that the evidence Manske wished to use to cross-examine Pszeniczka was irrelevant. The district court also prohibited Manske from inquiring into other witnesses’ potential bias in favor of Pszeniczka, because it believed that there was no link between the threat evidence and any fear one of the witnesses might have had.
Analysis
The defendant raises a number of issues on appeal, related both to his conviction and to his sentence; however, for our purposes, the only relevant question focuses on the government’s pre-trial motion in limine. Because we reverse the district court’s ruling on that motion, we need not address the defendant’s other arguments.[5]

The Pszeniczka Cross-Examination

Federal Rule of Evidence 608(b) is a rule of limited admissibility. Other than certain criminal convictions allowed into evidence by FRE 609, a witness’s specific instances of conduct may only be raised on cross-examination if they are probative of truthfulness or untruthfulness. As noted, the district court felt that the threat evidence was probative of Pszeniczka’s tendencies toward violence, and had no bearing on his probity or lack thereof. The defendant argues that these threats deal with more than mere violence — Pszeniczka’s willingness to threaten violence was a means to achieve an end of dissuading people from testifying truthfully in legal proceedings — and thus clearly implicates Pszeniczka’s truthfulness.
As a leading treatise notes, there are three ways of looking at 608(b): a broad one, a narrow one, and a middle one. See Christopher B. Mueller & Laird C. Kirk- *775 Patrick, FedeRál Evidenoe, 154-55 (2d ed.1994). The broad view holds that “virtually any conduct indicating bad character indicates untruthfulness, including robbery and assault.” Id. This view is untenable, as it would open the door to a potentially mind-numbing array of questions on every cross-examination. It would also “pave the way to an exception [to 608(b)’s limitations] that swallows the rule ... [because it] adopts the hypothesis that all bad people are liars, which is an unverifiable conclusion.” Joseph M. McLaughlin, Wein-stein’s FedeRal Evidence, § 608.12[4][c] 608-39 (2d ed.1999). The narrow reading of the rule, which the government essentially urges on us, considers a crime as bearing on veracity only if it involves falsehood or deception, such as forgery or perjury. Mueller & Kirkpatrick at 154. The middle view “is that behavior seeking personal advantage by taking from others in violation of their rights reflects on veracity.” Id. While this generally does not cover “personal crimes” involving violence, it does not necessarily exclude all such acts. Id. The threat evidence would clearly be allowed in under the broad view, and probably excluded under the narrow orle. Whether it would fit under the middle view is a more vexing question.
Mueller and Kirkpatrick note that “[u]n-der some circumstances, it seems wise to allow questions that would not be embraced by the more focused view but would pass muster under the middle view, and there appears to be a trend in this direction [among courts].” Id. at 159-160. Their treatise discusses a circumstance nearly identical to this one, where although the specific instance of conduct may not facially appear relevant to truthfulness, closer inspection reveals that it bears on that issue. “[W]hen [a party’s question is] specific and well-founded, the cross-examiner should be allowed to ask ... questions on acts better described as dishonest than false.... [including questions related to] concealing or frightening off witnesses or suborning perjury (even in unrelated cases.)” Id. at 160-161 (emphasis added).
We have not had many occasions to address the scope of 608(b); however, when we have our approach has been closest to the middle view. For example, in Varhol v. National RR Pass. Corp., we rejected the plaintiffs contention that 608(b) only allowed questioning about acts involving fraud or deceit, such as perjury, subornation of perjury, false statements, embezzlement and false pretenses. 909 F.2d 1557, 1566 (7th Cir.1990) (en banc) (per curiam). We held that although “receiving stolen goods [fell] into a gray area,” the plaintiff could be questioned about buying stolen railroad tickets because “people generally regard stealing (and receiving and using stolen property) as acts that ‘reflect adversely on a [person’s] honesty and integrity.’ ” Id. (quoting Gordon v. United States, 383 F.2d 936, 940 (D.C.Cir.1967)); see also United States v. Smith, 80 F.3d 1188, 1193 (7th Cir.1996) (under 608(b) witness could be cross-examined regarding prior thefts for which he was not charged because “acts of theft ... are, like acts of fraud or deceit, probative of a witness’s truthfulness or untruthfulness.”); United States v. Zizzo, 120 F.3d 1338, 1355 (7th Cir.1997) (cross-examination about defendant’s receipt of stolen tires not precluded under 608(b)); United States v. Wilson, 985 F.2d 348, 351 (7th Cir.1993) (allowing questions on defendant’s failure to file federal income tax returns and bribery as probative of untruthfulness under 608(b)); United States v. Fulk, 816 F.2d 1202, 1206 (7th Cir.1987) (improper for district court to prevent questioning on whether defendant lost his chiropractor’s license because of deceptive practices). In Varhol, the full court observed that “if the witness has no compunctions against stealing another’s property ... it is hard to see why he would hesitate to obtain an advantage for himself or a friend in trial by giving false testimony.... As a practical matter, it is difficult to distinguish between untruthfulness *776 and dishonesty.” 909 F.2d at 1567 (per curiam).
Although the factual context of Varhol differs, the relationship between the specific acts of misconduct and truthfulness is, if anything, more compelling in this case. Threatening to cause physical harm to a person who proposes to testify against you is at least as probative of truthfulness as receiving stolen tires or a stolen railroad ticket. Also, because Stephen Pszeniczka had no compunction about intimidating potential witnesses in previous legal proceedings, “it is hard to see” why he would hesitate to obtain an advantage for himself in Manske’s trial by giving false testimony against Manske. The advantage he hoped to obtain, it appears, was leniency from the government in return for his testimony. Pszeniczka had already been given ten years off of his sentence for cooperation in a prior prosecution, and acknowledged that if the remaining thirty years of his sentence was not reduced, he would likely die in prison. Because of the sum of these facts, we conclude it was legally erroneous for the district court to conclude that the threat evidence was irrelevant under 608(b).[6]
The government urges us to reject the defendant’s argument that this was error because the district court is entitled to great deference. See FRE 608(b) (specific instances of conduct may be inquired into “in the discretion of the court.”). Recognizing that a district court’s decision as to 608(b) is ordinarily reviewed for an abuse of discretion, United States v. Nelson, 39 F.3d 705, 709-10 (7th Cir.1994), does not change our view of this matter. The usual deference does not apply when a district court incorrectly categorizes the nature of the evidence.[7] Here, the trial court construed the threat evidence too narrowly: its error was in perceiving the threats as probative only of violence (which — if correct — would have been a proper reason to grant the government’s motion in limine). However, because the threat evidence also implicated Pszenicz-ka’s truthfulness, the government’s motion should have been denied. Thus, this is not the prototypical case where we give deference to a district court’s decision to exclude evidence because it was repetitive, see United States v. Covelli, 738 F.2d 847, 856 (7th Cir.1984), unfairly prejudicial, see United States v. Davis, 838 F.2d 909, 916 (7th Cir.1988), or might cause confusion. See United States v. Fruth, 36 F.3d 649, 653 n. 7 (7th Cir.1994).[8]
The government maintains that even if the district court’s decision was erroneous, the error was harmless. While we might have accepted this argument if 608(b) was the only issue the defendant raised on appeal, because of the inter-relatedness of Manske’s two claims, we cannot assess the level of harm this error caused in a vacuum. Instead, we can only determine whether it was harmless in conjunction *777 with our discussion of the district court’s ruling prohibiting the defendant from using the threat evidence to probe the biases of other witnesses.

Limitations on Establishing Witness Bias

The defendant’s theory of the case was that Pszeniczka fabricated his testimony to frame him, and that other witnesses—including Mary Colburn and Jackie Campbell—corroborated this false story because they feared what Pszeniczka or his associates would do to them if they contradicted him. Had the district court not barred him from doing so, Manske hoped to probe this matter through cross-examination, thus undermining these other witnesses’ testimony.
Unlike the Rule 608(b) issue discussed above, no federal rule of evidence is directly pertinent. However, it is well established that a witness may be cross-examined for bias. We have noted that “bias is one of five acceptable methods of attacking a witness’s credibility.” United States v. Lindemann, 85 F.3d 1232, 1243 (7th Cir.), cert. denied, 519 U.S. 966, 117 S.Ct. 392, 136 L.Ed.2d 307 (1996); see United States v. Abel, 469 U.S. 45, 50, 105 S.Ct. 465, 83 L.Ed.2d 450 (1984) (despite absence of explicit mention of bias in federal rules, bias is “permissible and established basis of impeachment.”). Indeed, it is the “quintessentially appropriate topic for cross-examination.” Bachenski v. Malnati, 11 F.3d 1371, 1375 (7th Cir.1993). Bias is always relevant, and parties should be granted reasonable latitude in cross-examining target witnesses. United States v. Frankenthal, 582 F.2d 1102, 1106 (7th Cir.1978). This latitude is wide enough, we believe, to encompass the ease before us, where the defendant’s theory was that the witnesses were biased against him because they feared for their personal safety, even though the incidents upon which they based that fear arose outside the context of this case. See Muller and Kirkpatrick, Federal Evidence, 401-02 (2d ed. 1994) (“[PJarties should be given considerable leeway, by wide-ranging inquiry on cross.... Proof of bias may properly show the following ... fear by the witness for his [or her] personal safety or the safety of friends or family, relating to the parties or issues in suit.”). See also Abel, 469 U.S. at 52, 105 S.Ct. 465 (“Bias may be induced by a witness’s likes, dislikes, [or] fear ... or by the witness’s self-interest.”); United States v. Shyllon, 10 F.3d 1, 3-4 (D.C.Cir.1993) (District court erred when it prohibited defendant from calling a witness (Mr. Tessamichael) and cross-examining a government investigator about whether investigator had attempted to intimidate Tessamichael into testifying a certain way—even though the government never called Tessamichael at trial: “[s]urely testimony that the investigator had intimidated Tessamichael bears on the probability that he had also intimidated the government’s witnesses.”) In reaching our conclusion, we emphasize how closely this point and the 608(b) issue are entwined. If the bias question arose alone and was not, in combination, so central to the case, we might not consider it relevant.
As it did regarding the 608(b) issue, the government argues that even if the district court construed the defendant’s right to inquire into witness bias too narrowly, its decision is saved by the deferential standard we use in reviewing the district court’s limitations on cross-examination. See United States v. Sasson, 62 F.3d 874, 882 (7th Cir.1995), cert. denied, 516 U.S. 1131, 116 S.Ct. 953, 133 L.Ed.2d 876 (1996) (trial court’s restrictions on cross-examination normally reviewed for abuse of discretion). Indeed, this court gives district courts “wide latitude” and “allows [them] to set reasonable limits on the scope and extent of cross-examination based on concerns about ... harassment, prejudice, confusion of the issues, the witness’s safety [and] marginal ] relevance.” United States v. Graffia, 120 F.3d 706, 712 (7th Cir.1997). However, when a restriction impacts a defendant’s Sixth Amend *778 ment right to confrontation, review is de novo. United States v. Scott, 145 F.3d 878, 887-88 (7th Cir.1998). The line between de novo and deferential review is marked by, on one side “the core values of the confrontation right,” and on the other “more peripheral concerns which remain within the ambit of the trial judge’s discretion.” Graffia, 120 F.3d at 712.
As we noted, exposing witness bias is at the “core” of the confrontation right. However, the Sixth Amendment is not implicated every time a limit is placed on a defendant’s right to expose bias. When a defendant is allowed to expose an individual’s particular motive to lie, “it is of peripheral concern to the Sixth Amendment how much opportunity defense counsel gets to hammer that point down to the jury.” United States v. Sasson, 62 F.3d at 882. If, however, “the defense is completely forbidden from exposing the witness’s bias or motive to testify,” then the constitution is implicated. Id. at 883 (footnote omitted). When such a prohibition occurs, there may be insufficient information presented to the jury for its appraisal of a witness. Id. In this case the district court entirely prevented the defendant from asking Colburn and Campbell about their fear of Pszeniczka and its relationship, if any, to their testimony against Manske. This complete ban cut off an important avenue for the defendant to expose those individual’s alleged bias and motive to testify as they did, leaving the jury short of potentially essential information.
The government only makes a perfunctory legal argument on this issue. Nevertheless, to satisfy our judicial obligations, we must examine relevant precedent to ensure the correctness of our conclusion. A recent case in this area, United States v. Scott, 145 F.3d 878 (7th Cir.1998), would, at first blush, appear to bolster the government’s general contention that no Sixth Amendment violation occurred. However, careful analysis reveals important distinctions. In Scott, the district court allowed the defendant to ask a litany of questions about a government witness’s potential biases, but limited her ability to ask questions about the witness’s past drug use. Id. at 887. The defendant argued on appeal that these limitations deprived her of a fair trial, and that her conviction should be reversed. Id. We held that “because the district court allowed Scott’s attorney to expose [the witness’s] motives and biases,” no Sixth Amendment violation occurred. Id. at 888. However, the limits the district court imposed on cross-examination in Scott were far less onerous than they are here. Importantly, the district court allowed a number of questions about the defendant’s drug use, only imposing restrictions on questions which were patently irrelevant. Id. at 887-88. See also United States v. Aguilar, 948 F.2d 392, 397 (7th Cir.1991) (no Sixth Amendment violation because only one question was blocked on cross-examination, and the next question “appears to have elicited much of the same information. Any bias of [the witness] was brought out on cross-examination.”); United States v. Muelbl, 739 F.2d 1175, 1185-86 (7th Cir.1984) (despite limitations on cross-examination, it was “apparent that defense counsel was able to establish [the defendant’s] defense, that is, the apparent motives and biases of [the witnesses against him].”) Given the particular facts before us, none of these cases dictate a different result.
As an alternative argument, the government asserts that the district court’s ruling was correct because Manske did not lay a “proper foundation” for asking the bias-related questions. At trial, when Manske renewed his objection to the district court’s limitations on his cross-examination of Colburn and Campbell, the trial judge reaffirmed his earlier decision, noting that because the defendant had not established a clear nexus between the threats and his theory of the case by asking specific kinds of questions, cross-examination could not proceed into this area. *779 However, we find no support for such a requirement in our case law.
Indeed, one commentator has expressly noted “[tjhere are no special foundational requirements for bias evidence; the [party] may prove any fact or event logically relevant to show bias.” Edward J. Im-winkelreid, Evidentiary Foundations, 164 (4th ed.1998). As we have already noted, the questions Manske sought to ask were “logically relevant to show bias.” Thus, the only “necessary” questions the defendant need ask are the “who, what, why, where and when” of the specific incidents he claims give rise to bias. Id.[9] If accepted, the government’s argument in its brief that the defendant needed to explicitly ask questions like: “are you presently afraid of Steve Pszeniczka?” or “do you feel pressured to testify a certain way because of Steve Pszeniczka?” would dramatically limit the effectiveness of many cross-examinations. See Id. at 164-65 (Most experienced counsel avoid attempts to obtain a direct concession from a witness that he is biased, because the witness rarely makes the concession, and “in the attempt to force the concession, the counsel might become argumentative. Experienced counsel prefer to invite the jury to draw the inference of bias during closing arguments.”); see also Thomas A. Mauet, Fundamentals of TRIAL Techniques, 254-59 (2d ed.1988) (cross-examiner should not ask directly about bias, but instead should make point through suggestion that a witness has a motive or bias to lie). Thus, since such a “foundation” was not required, its absence cannot be used as a reason to deny the defendant the opportunity to ask these questions about bias.
As with the 608(b) issue, the government claims that any error was harmless. A constitutionally improper denial of cross-examination is subject to harmless error analysis, and does not necessarily undermine the integrity of a jury’s verdict. United States v. Scott, 145 F.3d at 888 (citing Delaware v. Van Arsdall, 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)). However, as we noted above, because the two errors are inextricably connected, the errors cannot be analyzed separately—instead we must examine their cumulative effect.

The Cumulative Effect of the District Court’s Rulings

The government argues that even if, as we have found, the trial court erred in its evidentiary rulings, the errors were harmless. To determine whether a trial judge’s rulings were harmless, this court inquires into: the importance of a witness’s testimony in the government’s case; the presence or absence of corroborating or contradictory evidence; and the extent of cross-examination permitted during the trial. We also must assess the overall strength of the prosecution’s case against the defendant. Scott, 145 F.3d at 888 n. 4 (citing Van Arsdall, 475 U.S. at 684, 106 S.Ct. 1431).
The most important issue factor in this case is the centrality of “a witness’s testimony in the government’s case.” Here, the district court’s errors impacted the cross-examination of three of the government’s key witnesses. Because of the lack of physical evidence against the defendant, the jury’s assessment of Pszeniczka’s credibility had to have been critical to its verdict. As we recently noted, “when the credibility of a witness plays a pivotal role in a conviction, it may become an issue upon which we will reverse [that] conviction.” Crivens v. Roth, 172 F.3d 991, 998 (7th Cir.1999). In Crivens, we observed that a “propensity to lie to police officers, prosecutors and even judges” is especially damaging to a witness’s credibility. Id. There, one of the state’s key eye-witnesses *780 had such a propensity, which the fact-finder in the defendant’s trial did not know about. Id. Crivens held that if the witness’s propensity for lying to these figures had been known, “it would have perhaps given [the fact-finder] the reason it did not find to decide that [the witness] might have been lying again.” Id. at 999. If the fact-finder had reached such a conclusion, “the state’s case would have been severely damaged” and a different outcome may have resulted. Id.
We believe that a bent toward threats and intimidation of potential witnesses in a judicial proceeding (or those considering cooperating with law enforcement) is as serious as the tendencies noted in Crivens. We cannot say for certain that, on its own, this would have been enough for the jury to change its mind. However, Pszenicz-ka’s threatening actions could plausibly have biased other witnesses who were either targets of those threats, or who were familiar with them. Because both strands of this evidence were kept from the jury, we lack confidence in the ultimate soundness of Manske’s conviction. We think it possible that this information could have given the jury strong grounds to find that Pszeniczka was lying, and that the other witnesses’ testimony was suspect. As in Crivens, such a conclusion would have badly damaged the government’s case, potentially leading to a different outcome. Accordingly, in these circumstances, this factor tilts heavily in favor of finding that the error was not harmless.
Another issue we must address is the presence or absence of corroborating evidence. Scott, 145 F.3d at 888. In this case, aside from the testimony of witnesses whose cross-examinations we have held were improperly restricted, the evidence is limited. Thus, this is far different from our recent decision in United States v. Span, where we found that if the district court had erred in limiting cross-examination of a prosecution witness, it was harmless. 170 F.3d 798, 803 (7th Cir.1999). There, in addition to having a witness testify that he purchased drugs from the defendant, the government presented evidence through two police officers about their “extensive monitoring” of the defendant’s drug transactions. Id. One of the officers testified that through a drug buyer’s body wire, he heard the defendant conducting a drug sale. Id. No such independent corroboration exists in this case.
The issue of the strength of the prosecution’s case is essentially subsumed in our discussion of the centrality of these witnesses to the government, and the general lack of independent corroborating evidence. Like the first two issues we have examined, it too counsels for a finding that this was not harmless error.
The final factor to be considered is the extent of cross-examination allowed at trial. The government is correct that the district court allowed Manske to impeach Pszeniczka, Colburn and Campbell by pointing out their past drug use, their prior records of conviction and the fact that each was receiving leniency in this case, or had received leniency from the government in the past. In the harmless error analysis, this is clearly the government’s strongest argument. However, as we have already discussed, because the threat evidence provided such potentially important insight into these witnesses, we cannot agree with the government’s assertion that “there was little more that the threat evidence could have added to proving or disproving [the witnesses’] truthfulness.” Thus, we reject the government’s argument that the district court’s errors were harmless.
Conclusion
While it is a most unusual case in which we order a new criminal trial based on a district court’s evidentiary rulings, this is such a case. Accordingly, for the reasons we have discussed, the defendant’s conviction is ReveRsed and this case is REMAND *781 ed to the district court for a new trial consistent with this opinion.

. Because we reverse Manske's conviction, we dismiss his motion of April 9, 1999, to stay this appeal pending the briefing and argument of his appeal from the district court’s denial of his motion for a new trial.

. Judge Shabaz, the district court judge in this case, also presided over Tushoski's trial.

. These details come from the defendant's offer of proof, which was before the district court, and is part of the record on appeal. We note this because the government asserts in its brief that one ground for affirming the district court's ruling on the motion in limine is the defendant's failure to make such an offer. As the government acknowledged at oral argument, its assertion was incorrect. We reiterate the paramount importance we place on accuracy in submissions to this *774 court. See United States v. Hack, 162 F.3d 937, 948 (7th Cir.1998).

. "Specific instances of conduct of a witness, for the purpose of attacking or supporting the witness’ credibility, [other than what is allowable under FRE 609] may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness....”

. In the absence of specificity on Manske’s part, we construe his request for a new trial as asking only to allow questioning of these witnesses on the threat evidence. He clearly would be prohibited under 608(b) from using extrinsic evidence of specific instances of conduct against Pszeniczka. On the issue of bias, any determinations on the admissibility of extrinsic evidence must be made by the district court based on the factors laid out in Young v. Rabideau, 821 F.2d 373, 378 & n. 3 (7th Cir.1987).

. Although it is of no precedential value, we note that the only other Court of Appeals to directly address this issue found that “alleged incidents of witness intimidation were certainly probative of truthfulness and pertinent under Rule 608(b).” United States v. Phillips, 48 F.3d 1218, 1995 WL 82503 at *3 (4th Cir.1995) (unpublished order). See also United States v. Smith, 792 F.2d 441, 443 (4th Cir.1986) (on cross-examination, government could show that defendant had previously sought to obtain absence of a material prosecution witness).

. Assuming deference, our conclusion might not differ, as appellate courts sometimes reverse convictions based on evidentiary rulings even when those rulings are reviewed under the abuse of discretion standard. See United States v. Amerson, 185 F.3d 676 (7th Cir. 1999), (Posner, C.J., dissenting) (collecting cases).

.We also note that the questions Manske sought to ask were not part of a broad fishing expedition. The district court, government and defense were all familiar with the threat subject matter. This is salient, in light of Mueller & Kirkpatrick’s point referenced above — which we endorse — that questions such as those asked by Manske should be allowed when they are “specific and well founded.”

. Of course, a district court may require some showing that the answers the cross-examination hopes to elicit are relevant, but the "who, what, why” questions are designed to achieve this result. Moreover, in this case, the relevance of Pszeniczka's prior threats seems readily apparent.